**INTERSTATE FIRE & CASUALTY COMPANY, an Illinois corporation, Plaintiff,**

v.

**ARCHDIOCESE OF PORTLAND IN OREGON, an Oregon corporation; Underwriters at Lloyd's, London, subscribing to policies numbered SL 3391/SLC 5411 and SL 3831/SLC 5843; Excess Ins. Co. Ltd., a United Kingdom corporation; Yasuda Fire & Marine Ins. Co. Ltd. (U.K.), a United Kingdom corporation; Terra Nova Ins. Co. Ltd., a United**

**Kingdom corporation; Certain Other Underwriters subscribing to policies SL 3391/SLC 5411 and SL 3831/SLC 5843; and Universal Reinsurance Corp., a New Jersey corporation, successor to Bellafonte Ins. Co., Defendants.**

**Civ. No. 88–934–FR.**

United States District Court, D. Oregon.

Sept. 20, 1990.

Robert J. Ericsson, Mary–Anne S. Rayburn, Martin, Bischoff, Templeton, Ericsson & Langslet, Portland, Or., for plaintiff.

Charles H. Habernigg, P. Conover Mickiewicz, Meyer, Habernigg & Wyse, Portland, Or., for defendant Archdiocese of Portland in Oregon.

Milo Petranovich, Spears, Lubersky, Bledsoe, Anderson, Young & Hilliard, Portland, Or., Richard F. Johnson, Lord, Bissell & Brook, Chicago, Ill., for defendants Underwriters at Lloyd's, London, Excess Ins. Co. Ltd., Yasuda Fire & Marine Ins. Co. Ltd. (U.K.), Terra Nova Ins. Co. Ltd. and Universal Reinsurance Corp.

## OPINION

FRYE, District Judge:

The matters before the court are:

1. the motion for summary judgment (# 65) of defendants Underwriters at Lloyd's, London, subscribing to policies numbered SL 3391/SLC 5411 and SL 3831/SLC 5843 (Lloyd's); Excess Ins. Co. Ltd. (Excess); Yasuda Fire & Marine Ins. Co. Ltd. (U.K.) (Yasuda); Terra Nova Ins. Co. Ltd. (Terra Nova); and Universal Reinsurance Corp. (Universal) (collectively, the Lloyd's defendants);

2. the motion for partial summary judgment (# 74) of plaintiff, Interstate Fire & Casualty Company (Interstate);

3. the amended motion for partial summary judgment (# 87) of defendant the Archdiocese of Portland in Oregon (the Archdiocese);

4. the supplementary motion for summary judgment (# 89) of the Archdiocese; and

5. the cross-motion for summary judgment (# 96) of Interstate.

This is an action for a declaratory judgment to determine the rights and obligations of the parties under policies of insurance issued by the plaintiff, Interstate, and the Lloyd's defendants, and an action by Interstate to recover a money judgment for sums it paid to a claimant under these policies. By an order dated August 15, 1989, the court bifurcated and stayed proceedings as to some of the counterclaims asserted against Interstate by the Archdiocese. The counterclaims of the Archdiocese which pertain to coverage and attorney fees remain for decision.

## UNDISPUTED FACTS

Interstate is an insurance company organized under the laws of the State of Illinois. The Archdiocese is a non-profit corporation organized under the laws of the State of Oregon. Lloyd's is an association of insurance underwriters located in the United Kingdom. Excess, Yasuda, and Terra Nova are insurance companies organized under the laws of the United Kingdom. Universal is an insurance company organized under the laws of the State of New Jersey.

During the period from July 1, 1978 through July 1, 1984, the Archdiocese was the insured under policies issued by the Lloyd's defendants and under excess insurance policies issued by Interstate. The Lloyd's policies require the Archdiocese to make a self-insured retention payment (SIR payment) toward a claim before payment under the policy is triggered. The SIR payment for which the Archdiocese was responsible during the period 1978–1984 increased from $60,000 during the first year of coverage to $100,000 during the last

three years of coverage.[1] The Lloyd's policy provided payment for any amount of a covered claim in excess of the SIR payment to the policy limit of $200,000 per occurrence. The Interstate policy provided coverage for any covered claim against the Archdiocese which exceeded the $200,000 limit of the combined Lloyd's/SIR coverage, up to Interstate's policy limit of $5,000,000 per occurrence.[2]

Relevant portions of the Lloyd's policy provide:

Underwriters hereby agree ... to indemnify the Assured for all sums which the Assured shall be obligated to pay by reason of the liability imposed upon the Assured by law ... for damages ... on account of personal injuries ... arising out of any occurrence happening during the period of Insurance.

. . . .

The term "personal injuries" wherever used herein, shall mean:

(a) Bodily Injury, Mental Injury, Mental Anguish, Shock, Sickness, Disease, Disability, False Arrest, False Imprisonment, False Eviction, Detention, Malicious Prosecution, Discrimination, Humiliation, Invasion of Right of Privacy, Libel, Slander or Defamation of Character; also Piracy and any Infringement of Copyright or of property.

. . . .

The term "occurrence" wherever used herein shall mean an accident or a happening or event or a continuous or repeated exposure to conditions which unexpectedly and unintentionally results in personal injury, or damage to property during the policy period. All such exposure to substantially the same general conditions existing at or emanating from one location shall be deemed one occurrence.

Lloyd's Policy No. SL 3391, pp. PAC–8—PAC–10.

The applicable language in the Interstate policies for each of the six years provides:

To indemnify the insured for the amount of loss which is in excess of the applicable limits of liability of the underlying insurance inserted in column II of item 4 in the declarations [here $200,000]; provided that this policy shall apply only to those coverages for which a limit of liability is inserted in column I; provided further that the limit of the company's liability under this policy shall not exceed the applicable amount inserted in column I [here $5,000,000].

The provisions of the immediate underlying policy are incorporated as a part of this policy except for any obligation to investigate and defend and pay for costs and expenses incident to the same, the amount of the limits of liability, and "other insurance" provision and any other provisions therein which are inconsistent with the provisions of this policy.

Interstate Policy Jacket, p. 2, Part I.

It is hereby understood and agreed that the definition of loss is amended to read as follow[s]:

"Loss" means the sums paid as damages in settlement of a claim or in satisfaction of a judgment for which the insured is legally liable, after making deductions for all recoveries, salvages and other insurances (whether recoverable or not) other than the underlying insurance and excess insurance purchased specifically to be in excess of this policy. "Loss" includes investigation, adjustment, defense or appeal costs, and expenses, costs and expenses incident to any of the same, notwithstanding that the underlying insurance may provide insurance for such costs and expenses.

Interstate Policy, p. 5, Endorsement No. 3.

It is, therefore, agreed that the company shall act in concert with all other inter-

---

1. The SIR payment of the Archdiocese for each of the six policy years was: $60,000 in 1978–1979, $75,000 in 1979–1980, $75,000 in 1980–1981, and $100,000 in the three policy years 1982–1984. Each policy year began on July 1 and extended to July 1 of the following year.

2. The Archdiocese paid premiums to Interstate of $39,900 in 1978–79, $37,995 in 1979–80, $39,995 in 1980–81, $38,500 in 1981–82, $38,500 in 1982–83, and $38,500 in 1983–84.

ests concerned, including the insured, in the enforcement of any subrogation rights or in the recovery of amounts by any other means.

Interstate Policy Jacket, p. 4, Condition 4. The company at its own option may, but is not required to, participate in the investigation, settlement or defense of any claim or suit against the insured.

Interstate Policy Jacket, p. 4, Condition 2.

*The Grgich Claim*

In June, 1983, Father Thomas P. Laughlin, a Roman Catholic priest in the Archdiocese, was arrested for the sexual abuse of children. Father Laughlin entered a plea of guilty and was sentenced to jail.

In 1985, Fred Grgich filed an action in the Circuit Court of the State of Oregon for the County of Multnomah against the Archdiocese and Father Laughlin (the Grgich action). The relevant complaint, the second amended complaint, alleges claims for 1) sexual assault and battery during the period from 1974 through 1985; 2) negligence on the part of the Archdiocese in not taking measures to prevent the misconduct of Father Laughlin; 3) breach of trust; and 4) outrageous intentional conduct.

The claims against the Archdiocese and Father Laughlin in the Grgich action were settled for $500,000. The parties to the current action agree that the settlement amount of $500,000 was a reasonable settlement of the claims in the Grgich action. The settlement and defense costs were paid in the following manner:

| | | |
|---|---|---|
| $50,000 | — | from Father Laughlin |
| $74,997 | — | from the Archdiocese ($18,315.19 paid to Grgich; remainder to fees) |
| $125,000 | — | from Lloyd's |
| $346,909.54 | — | from Interstate ($306,684.81 paid directly to Grgich, and $40,224.73 paid to the Archdiocese for defense costs) |

The Archdiocese was negligent from approximately July 15, 1979 through June, 1983 (policy years 2, 3, 4 and 5) in failing to supervise Father Laughlin and/or remove him from a position in which he had the opportunity for sexual abuse of minors such as Grgich. Laughlin did not have sexual contact with Grgich in policy year 1, but such contact took place in policy years 2, 3, 4 and 5. There is no factual basis upon which to divide the personal injury or damage to Grgich among the various policy years.[3]

## CONTENTIONS OF THE PARTIES

Interstate contends that as a matter of law there were one or more "occurrences" (as that term is defined in the insurance policies at issue) during each of the four years, 1979–1983, for which the Archdiocese was legally liable for the misconduct of Father Laughlin with respect to Grgich. It claims that it is entitled to reimbursement for all sums it paid toward the settlement of the Grgich claim because the underlying SIR payment made by the Archdiocese and the limits of the Lloyd's policies would not have been exhausted so as to trigger coverage under Interstate's policy.

Interstate's argument centers on the interpretation of the term "occurrence" as used in its policy and the policy of Lloyd's. Interstate contends that each act of sexual molestation by Father Laughlin constitutes an occurrence under its policy. In support of its position, Interstate points to the fact that the Archdiocese entered into a new insurance contract for each policy year. Interstate also argues that the injury to Grgich was indivisible with respect to the number of occurrences, and therefore the amount of damages awarded should be divided equally among the four years in

---

**3.** In addition to Grgich, six other claimants made claims against the Archdiocese based on the behavior of Father Laughlin. Five of these claims were settled without exceeding the limits of the underlying Lloyd's policies so that coverage under the excess insurance policy of Interstate was not triggered. The sixth claim was settled for $210,882.37, with $10,000 provided by Interstate. This claim was based on only

one incident and did not preciptitate any dispute regarding coverage under the Interstate policy.

Lloyd's treated each of these claims as a single occurrence, the damages from which were allocated to the policy period in which the first explicit sexual activity occurred. Each of these claims was settled prior to the settlement of the Grgich action.

which the molestations occurred. Under Interstate's theory, coverage under Interstate's excess insurance policy would not be triggered. The Grgich claim would then be paid as follows:

| Year | Amount paid by Archdiocese (SIR) | Amount paid by Lloyds | Amount paid by Interstate |
|---|---|---|---|
| 1979–80 | $ 75,000 | $50,000 | $0 |
| 1980–81 | $ 75,000 | $50,000 | $0 |
| 1981–82 | $100,000 | $25,000 | $0 |
| 1982–83 | $100,000 | $25,000 | $0 |

Lloyd's and the Archdiocese contend that as a matter of law the acts giving rise to the Grgich claim constitute a single occurrence within the terms of the policies of both Interstate and Lloyd's and that the single occurrence which triggered coverage was the negligence of the Archdiocese in failing to properly supervise or remove Father Laughlin. They contend that Interstate is not entitled to reimbursement of any of the money expended in settlement of the Grgich claim.

## APPLICABLE LAW

Summary judgment is appropriate only where "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The initial burden is on the moving party to point out the absence of any genuine issue of material fact. Once the initial burden is satisfied, the burden shifts to the opponent to demonstrate through the production of probative evidence that there remains an issue of fact to be tried. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986).

On a motion for summary judgment, all reasonable doubt as to the existence of a genuine issue of fact should be resolved against the moving party. *Hector v. Wiens*, 533 F.2d 429, 432 (9th Cir.1976). Where different inferences can be drawn, summary judgment is inappropriate. *Sankovich v. Life Ins. Co. of N. Am.*, 638 F.2d 136, 140 (9th Cir.1981).

## ANALYSIS AND RULING

▬ The primary rule for the interpretation and construction of insurance contracts is to ascertain and give effect to the intentions of the parties to the contract. *Totten v. New York Life Ins. Co.*, 298 Or. 765, 770, 696 P.2d 1082 (1985). Where a policy contains ambiguous language, any reasonable doubt as to the meaning of the language of the policy must be resolved against the insurance company. *Travelers Indem. Co. v. United States*, 543 F.2d 71 (9th Cir.1976). In this case, the parties dispute the meaning of the term "occurrence" in the policies at issue. Resolution of this dispute depends upon an analysis of the language of the policies in the context of the fundamental rules of contract construction and pertinent case law.

The policies of both Interstate and Lloyd's can be fairly characterized as occurrence policies. Occurrence policies indemnify the insured for acts or occurrences which take place within the policy period. *Appalachian Ins. Co. v. Liberty Mut. Ins. Co.*, 676 F.2d 56, 59 (3d Cir.1982). The interpretation of occurrence policies has been the subject of numerous court decisions. *See Barrett v. Iowa Nat'l Mut. Ins. Co.*, 264 F.2d 224 (9th Cir.1959); *Maurice Pincoffs Co. v. St. Paul Fire and Marine Ins. Co.*, 447 F.2d 204 (5th Cir.1971). The majority of courts which have considered this question subscribe to the "cause theory" to determine whether more than one occurrence has taken place. *American Indem. v. McQuaig*, 435 So.2d 414 (Fla.Dist. Ct.App.1983). Application of the cause theory depends upon whether there was one proximate, uninterrupted and continuing cause which resulted in all of the injuries and damage for which the claimant seeks

coverage. The question can be stated as: Was there a "single force which once set in motion caused multiple injuries?" *American Indem.*, 435 So.2d at 416.

■ The cause of an occurrence is the act or event which caused the injury exposing the insured to liability. *Michigan Chem. Corp. v. American Home Assur. Co.*, 728 F.2d 374, 382 (6th Cir.1984). Interstate argues that the Archdiocese is liable for the conduct of Father Laughlin on two principal grounds: direct liability for negligently supervising and failing to remove Father Laughlin from his position, and/or vicarious liability in its capacity as the employer of Father Laughlin.[4] Interstate contends that under either theory, each molestation of Grgich by Father Laughlin is a separate act which gives rise to a separate claim against the Archdiocese. Lloyd's and the Archdiocese contend that a single act, the continuous negligence of the Archdiocese in retaining and supervising Father Laughlin, caused the Archdiocese's exposure to liability.

Policies similar to those at issue here have been considered by other courts. In *Appalachian Ins. Co. v. Liberty Mut. Ins. Corp.*, 507 F.Supp. 59 (W.D.Pa.1981), *aff'd*, 676 F.2d 56 (3d Cir.1982), the court was presented with an insurance policy containing a definition of the word "occurrence" identical to that contained in the policies in this case. Liberty, the insured, had incurred losses in the settlement of class action litigation involving charges of sex discrimination based on certain employment policies it had adopted.

The Court of Appeals affirmed the district court's holding that the original act of adopting the employment policies caused the harm which exposed Liberty to liability, and thus constituted the single occurrence triggering policy coverage. In so holding, the district court had rejected the contention of Appalachian, the insurer, that because multiple injuries to various claimants resulted from the employment policies there were multiple occurrences for the purpose of determining coverage. The district court emphasized that the correct analysis for ascertaining the number of occurrences involved a determination of the underlying circumstances resulting in the claim for damages rather than the number of individual injuries resulting in claims. 507 F.Supp. at 62.

■ The Court of Appeals expanded on the district court's finding, holding that the fact that there were multiple injuries of differing magnitude which extended over a period of time did not preclude the existence of a single occurrence. The court concluded that the term "occurrence" as used in the policy contemplated the possibility of multiple and disparate impacts which might extend over a period of time all emanating from a single cause. 676 F.2d at 61. This reasoning applies to the policies at issue here. The wording of the relevant policies is that "exposure to sub-

---

**4.** Interstate alleges that Grgich could have prevailed against the Archdiocese in a claim based on respondeat superior, citing the case of *Erickson v. Christenson*, 99 Or.App. 104, 781 P.2d 383 (1989). In *Erickson*, the plaintiff brought an action against her pastor and the church which employed him claiming that she sustained injuries when the pastor manipulated and seduced her through a counseling relationship. The court held that because the plaintiff's claim was that the priest abused his position as her pastor to seduce her, the question of whether the alleged wrongful act occurred within the scope of his employment was a factual issue. *Erickson*, 99 Or.App. at 109 n. 3, 781 P.2d 383.

This court is not persuaded that *Erickson* controls this case. The successful claimant under the theory of respondeat superior must necessarily establish that the complained of acts occurred while the employee was acting within the scope of his/her employment. The Oregon Supreme Court recently stated three requirements necessary to conclude that an employee was acting within the scope of employment: the act must have occurred substantially within the time and space limits authorized by the employment; the employee must have been motivated, at least partially, by a purpose to serve the employer; and the act must be of a kind which the employee was hired to perform. *Chesterman v. Barmon*, 305 Or. 439, 442, 753 P.2d 404 (1988). Application of these criteria to the facts in this case leads the court to conclude that the sexual molestation of Grgich by Father Laughlin was not motivated by a purpose to serve the employer, and was not of a kind which Father Laughlin was hired to perform, making it unlikely that Grgich could have prevailed on such a claim.

stantially the same general conditions existing at or emanating from one location shall be deemed one occurrence." Lloyd's Policy No. SL 3391, p. PAC–10. Grgich was exposed to substantially the same general condition in the form of an abusive relationship, and this condition emanated from one location—the Archdiocese. The fact that Grgich suffered multiple injuries over a four-year period does not negate the finding of a single causal occurrence.

Both Interstate and Lloyd's cite *Michigan Chem. Corp.*, 728 F.2d 374 (6th Cir. 1984), in support of their opposing positions. In that case, Michigan Chemical Corp. (MCC), the insured, accidentally shipped a toxic flame retardant to a feed dealer rather than the feed supplement which it intended to ship. The dealer, unaware of the error, mixed the flame retardant with regular feed and sold the product to dairy farmers. Following some complaints by farmers, the error was detected and thousands of farm animals who had consumed the contaminated feed were destroyed. The affected owners filed hundreds of claims against the dealer and MCC.

The court held that the misshipment of the flame retardant was the single occurrence or act which caused liability for the purpose of establishing coverage. Additional misshipments of flame retardant would have created new liabilities, and thus would be separate occurrences. However, all claims arising from damages caused by the one misshipment were held to have stemmed from one uninterrupted cause.

The case before this court is analogous. The continuous negligent supervision of Father Laughlin by the Archdiocese was the act which exposed the Archdiocese to liability, just as the negligent misshipment of flame retardant was the act which exposed MCC to liability. Each time this negligent supervision presented Father Laughlin with the opportunity to molest a different child, the Archdiocese was exposed to new liability. However, all of the damages caused to one child by Father Laughlin represent only one occurrence because each time Father Laughlin molested

the same child, the Archdiocese was not exposed to new liability. Interstate's contention that each molestation of every child constituted an occurrence if superimposed on the facts of Michigan Chemical would have resulted in a holding that each individual claim constituted an occurrence. This result was clearly rejected by the court.

A factual situation more similar to this case was presented to the court in *Aetna Casualty & Surety Co. v. Medical Protective Co.*, 575 F.Supp. 901 (N.D.Ill.1983). A pediatrician prescribed a steroid-containing ointment for a patient suffering from conjunctivitis. Continuous use of the ointment was known to cause glaucoma. The patient received six refills of her prescription during six return visits to the pediatrician's office over a period of two years. The pediatrician never re-examined her for the possibility of incipient glaucoma or examined her eyes in any way. The patient's use of the ointment ultimately caused blindness.

The plaintiff, Aetna, argued that each prescription was the result of an independent cause because the pediatrician regained control over the situation each time the patient visited his office. The court disagreed and held that while the pediatrician may have had the opportunity to regain control during the subsequent office visits, the fact that he never re-examined the patient demonstrated that he had failed to exercise that opportunity. Only one decision was made—the original decision to prescribe the ointment—and any subsequent refills of the prescription simply implemented that prior decision. 575 F.Supp. at 903.

Similarly, the Archdiocese made one decision or omission—the decision to hire Father Laughlin or the omission to properly supervise or remove him. The continuous negligence implemented that decision or omission. Father Laughlin made one decision with respect to Grgich—the decision to sexually abuse him, and subsequent molestations implemented that decision to sexually abuse him.

Although each molestation undoubtedly contributed to Grgich's indivisible injury,

these individual acts did not expose the Archdiocese to new liability, and thus are not occurrences triggering coverage. Instead, a single but continuous act was the proximate cause of the injury to Grgich, and this single but continuous act gave rise to only one claim. Any direct liability on the part of the Archdiocese stems from its negligence in supervising and failing to remove Father Laughlin from his position. Although this negligence was present in each of the policy years at issue, it was continuous negligence, and not a number of discrete episodes of negligence. This continuous negligence was the single proximate cause of the resulting injury to Grgich and constitutes a single occurrence under the terms of both the policies of Interstate and Lloyd's.[5]

▮ Having concluded that the injuries to Grgich were the result of a single occurrence, the court turns to the question of coverage for injuries resulting from that occurrence. The determination of when an occurrence happens for purposes of establishing coverage must be made by reference to the time when the injurious effects of the occurrence took place. *Appalachian Ins. Co. v. Liberty Mut. Ins. Co.*, 676 F.2d at 61–62. For coverage to exist, the personal injury resulting from an accident or occurrence must take place within the policy period. *Id.* The parties agree that Grgich's personal injury happened in 1979, when Father Laughlin first molested him. The Archdiocese was insured under an Interstate policy at that time, and thus coverage exists.

The court finds, based on undisputed facts, that the damages arising from the Grgich complaint were the result of a single occurrence. The resulting injury occurred in the second year of coverage by Interstate. Interstate is not entitled to reimbursement of the money it spent in settlement of the Grgich claim. Because of this holding, the court need not reach the question of whether Interstate properly reserved its right to challenge coverage.

**5.** Assuming that Grgich could establish vicarious liability on the part of the Archdiocese, the wrongful acts of Father Laughlin which form the basis for this vicarious liability were the

## CONCLUSION

The motion for summary judgment of the Lloyd's defendants (# 65) is granted.

The motion for partial summary judgment of Interstate (# 74) is denied.

The amended motion for partial summary judgment of the Archdiocese (# 87) is rendered moot.

The supplementary motion for summary judgment of the Archdiocese (# 89) is granted.

The cross-motion for partial summary judgment of Interstate (# 96) is rendered moot.

continuing abusive relationship which he established with Grgich. The initiation of this relationship would be a single occurrence under the policies of Interstate and Lloyd's.