Argued and submitted September 3, certified questions answered December 9, 1993

INTERSTATE FIRE & CASUALTY COMPANY,
an Illinois corporation,
*Plaintiff,*

*v.*

ARCHDIOCESE OF PORTLAND IN OREGON,
an Oregon corporation;
Underwriters at Lloyd's of London, et al,
subscribing to policies numbered
SL 3391/SLC 5411 and SL 3831/SLC 5843;
Excess Insurance Co., Ltd.,
a United Kingdom corporation;
Yasuda Fire and Marine Insurance Company, (U.K.),
a United Kingdom corporation;
Terra Nova Insurance Co., Ltd.,
a United Kingdom corporation, et al,
*Defendants.*

(USDC CV-88-934-HJF; USCA 91-35610; SC S40077)

864 P2d 346

Honorable Dorothy W. Nelson, Honorable Stephen Trott, Honorable Thomas G. Nelson, United States Circuit Judges.

Timothy J. McNamara, of Onebane, Donohoe, Bernard, Torian, Diaz, McNamara & Abell, Lafayette, Louisiana, argued the cause for plaintiff and was on the brief filed by William D. Okrent and G. Marts Acker, of Acker • Okrent, Portland.

John R. Faust, Jr., of Schwabe, Williamson & Wyatt, Portland, argued the cause and filed the brief for defendant Archdiocese of Portland.

Richard F. Johnson, Chicago, Illinois, argued the cause and filed the brief for defendants Underwriters at Lloyd's et al., Excess Insurance Co., Ltd., Yasuda Fire and Marine Insurance Co., and Terra Nova Insurance Co. Ltd. With him on the brief were Hugh C. Griffin, Scott A. Kogen, Lord, Bissell & Brook, Chicago, Jeffrey M. Batchelor and Milo Petranovich, of Lane Powell Spears Lubersky, Portland.

Before Carson, Chief Justice, and Peterson, Gillette, Fadeley, Unis, and Graber, Justices.

GILLETTE, J.

## GILLETTE, J.

In this insurance case, a panel of the United States Court of Appeals for the Ninth Circuit certified five questions of law to this court. *See generally* ORS 28.200 to 28.255 (statutes governing certification). The questions certified to this court were the following:

"1. Under Oregon law, does the phrase 'occurrence happening during the period of insurance' refer to the occurrence of the damage or the occurrence of the act which caused the injury? *See Interstate*, 747 F. Supp. at 622.

"2. If occurrence refers to the act causing injury, does the tort of negligent supervision constitute a single occurrence or several divisible occurrences in sexual abuse cases involving multiple incidents over time and a negligent failure to supervise over a period of several policy years? *See Interstate*, 747 F. Supp. at 622.

"3. In answering question 2, does it matter if the supervisor 'regained control' on different occasions by specifically reexamining the negligent supervisory policy and deciding each time to do nothing? *See Aetna Casualty & Surety Co.*, 575 F. Supp. at 903.

"4. If continuing negligence constitutes a single occurrence, is that occurrence dated from the time it begins or the time it ends? *See Appalachian Insurance Co. v. Liberty Mutual Insurance Co.*, 676 F.2d 56, 61 (3d Cir. 1982); *Aetna Casualty & Surety Co.*, 575 F. Supp. at 903.

"5. Under Oregon law, can multiple policy periods be triggered when injury happens over multiple policy periods, notwithstanding that there is one 'occurrence' (i.e. one cause of the multiple injuries) in only one policy period? *See Diocese of Winona v. Interstate Fire and Casualty Co. et al.*, Nos. 3-90-0041 and 9-90-0527 (D. Minn. July 23, 1992); *John L. May, Archbishop of St. Louis v. Maryland Casualty Corporation, et al.*, No. 91-0155C(6) (E.D. Mo. June 5th 1992); *The Society of the Roman Catholic Church of the Diocese of Lafayette, Inc., et al. v. Arthur J. Gallagher*, No. 88-0289 (W.D. La. May 2, 1991)."

We conclude that it is the language and structure of the particular insurance policies at issue here, not the general tort law concepts suggested by the certified questions, that govern.

From July 1, 1978, to July 1, 1984, defendant Archdiocese of Portland in Oregon was insured under two liability policies consecutively issued by defendants Underwriters at Lloyd's of London[1] and under six consecutive excess insurance policies issued by plaintiff Interstate Fire & Casualty. The two Lloyd's policies were written for three-year periods each: the first from July 1, 1978, to July 1, 1981, and the second from July 1, 1981, to July 1, 1984. The six Interstate policies were written for annual periods, from July 1, 1978, to July 1, 1984, *i.e.*, for each of those same policy years. The Archdiocese's insurance coverage essentially was three-layered, with Lloyd's providing coverage in excess of a self-insured retention ("SIR") payment required of the Archdiocese, and with Interstate providing coverage in excess of the SIR and Lloyd's coverage. Under the policies, the Archdiocese's coverage per "occurrence" was as follows:

|  | SIR | Lloyd's | Interstate |
|---|---|---|---|
| 1978-1979 | $ 60,000 | $140,000 | $4,800,000 |
| 1979-1981 | $ 75,000 | $125,000 | $4,800,000 |
| 1981-1984 | $100,000 | $100,000 | $4,800,000 |

The relevant passage from the Lloyd's policies[2] provided:

"Underwriters hereby agree * * * to indemnify the Assured for all sums which the Assured shall be obligated to pay by reason of the liability imposed on the assured by law or assumed by the Named Assured under contract or agreement, for damages * * * on account of personal injuries * * * arising out of any occurrence happening during the period of Insurance."[3]

---

[1] As used herein, the term "Lloyd's" refers to all defendants except the Archdiocese.

[2] The Interstate policies incorporated the Lloyd's policies by reference.

[3] The Lloyd's policies defined the term "period of insurance" to mean any single year, from July to July, within the three-year term of the policy. For example, the policy in effect from July 1, 1978, to July 1, 1981, provided:

"The words 'period of insurance' shall be understood to mean any one of the following periods:

"Period I     July 1, 1978 to July 1, 1979
"Period II    July 1, 1979 to July 1, 1980
"Period III   July 1, 1980 to July 1, 1981[.]"

The policies defined "occurrence" as follows:

> "The term 'occurrence' wherever used herein shall mean an accident or a happening or event or a continuous or repeated exposure to conditions which unexpectedly and unintentionally results in personal injury * * * during the policy period. All such exposure to substantially the same general conditions existing at or emanating from one location shall be deemed one occurrence."

In 1985, an individual brought a civil action for damages against the Archdiocese and a priest within the Archdiocese, claiming that the priest had abused him sexually from 1979 through 1983 and that the Archdiocese was negligent in failing to prevent the abuse. The parties to that action settled for $500,000, and the Archdiocese called on Lloyd's and Interstate to contribute to the settlement and to the Archdiocese's defense costs. The settlement and defense costs were paid in the following manner: $50,000 by the priest; $74,997 by the Archdiocese ($18,315.19 to the settlement; $56,681.81 to defense costs); $125,000 by Lloyd's; and $346,909.54 by Interstate ($306,684.81 to the settlement; $40,224.73 to the Archdiocese for defense costs).

Following the settlement, Interstate brought the present action in federal court, seeking reimbursement for that portion of the settlement and defense costs that it had paid. Interstate argued that, as a matter of law, there was an "occurrence" in each of the four years during which the Archdiocese failed to prevent the sexual abuse.[4] Thus, according to Interstate, Interstate's policies never were triggered and the Archdiocese and Lloyd's were responsible for the entire portion of the settlement and defense costs paid by Interstate.[5]

---

[4] Alternatively, Interstate argued that each act of abuse constituted a separate "occurrence." Interstate has abandoned that argument.

[5] Under Interstate's theory, the Archdiocese and Lloyd's together were responsible for paying up to $800,000, as follows:

|            | Archdiocese's SIR | Lloyd's coverage |
| ---------- | ----------------- | ---------------- |
| 1979-1980  | $75,000           | $125,000         |
| 1980-1981  | $75,000           | $125,000         |
| 1981-1982  | $100,000          | $100,000         |
| 1982-1983  | $100,000          | $100,000         |
| Total      | $350,000          | $450,000         |

That amount exceeded the total of $546,906.54 paid by the Archdiocese, Lloyd's, and Interstate for the settlement and defense costs.

On motions for summary judgment, the district court disagreed. *Interstate Fire & Casualty Co. v. Archdiocese of Portland in Oregon*, 747 F Supp 618 (D Or 1990). The court concluded that the Archdiocese's "continuous negligence was the single proximate cause of the resulting injury to [the person] and [therefore] constitutes *a single occurrence* under the terms of both the policies of Interstate and Lloyd's." *Id.* at 625 (emphasis supplied). The court then concluded that "the resulting injury occurred in the second year of coverage." *Ibid.* Consequently, the district court held that Interstate was not entitled to reimbursement.

Interstate appealed to the Court of Appeals for the Ninth Circuit, and a panel of that court certified to this court the five questions of law set out above. We accepted certification in the belief that those questions presented important issues of Oregon law central to the disposition of the case. On further review, however, we have found reason to question the correctness of that belief, because it has become apparent that what lies at the bottom of the appeal before the Ninth Circuit is nothing more than a task of interpreting, under Oregon law, certain admittedly peculiar language contained in the particular insurance policies involved.

The parties agree that the Archdiocese was negligent continuously from approximately July 15, 1979, through June 1983 (years 2, 3, 4, and 5) in failing to prevent the sexual abuse. The parties also agree that sexual contact took place in years 2, 3, 4, and 5, and that each contact contributed to a cumulative and indivisible personal injury to the victim. Based on those facts, and on the language of the relevant policies, Interstate argues that there were four covered "occurrences," one in each year where there was both "negligent supervision and damage."

In rejecting Interstate's argument that there were four covered "occurrences" in this case, the district court relied on what the court called the "cause theory." According to the district court:

"The majority of courts which have considered this question subscribe to the 'cause theory' to determine whether more than one occurrence has taken place. * * * Application of the cause theory depends upon whether there was one proximate, uninterrupted and continuing cause which resulted in

all of the injuries and damage for which the claimant seeks coverage.''

*Interstate Fire & Casualty Co., supra*, 747 F Supp at 622-23 (citation omitted). As previously noted, the court concluded that the Archdiocese's negligence ''was the single proximate cause of the resulting injury * * * and constitutes a single occurrence under the terms of both the policies of Interstate and Lloyd's.'' *Id.* at 625.

■■    Under Oregon law, a proper assessment of Interstate's argument regarding the number of covered ''occurrences'' in this case does not begin where the district court appears to have begun, *i.e.*, with case law. Rather, it begins with an examination of the words of the applicable provisions in the insurance policy, because the court's task in interpreting an insurance policy is to determine the intention of the parties. ORS 42.240; *I-L Logging Co. v. Mfgrs. & Whlse. Ind. Exc.*, 202 Or 277, 317, 273 P2d 212, 275 P2d 226 (1954). The intention of the parties is determined based on the terms and conditions of the policy. ORS 742.016; *Hoffman Construction Co. v. Fred S. James & Co.*, 313 Or 464, 469, 836 P2d 703 (1992); *see also Roseburg School Dist. v. City of Roseburg*, 316 Or 374, 378 n 4, 851 P2d 595 (1993) (''The text of a document must always be the starting point in any interpretive endeavor.'').[6] When the task of both the trial and appellate courts is thus understood, it immediately becomes clear that the focus of the parties and of the Court of Appeals for the Ninth Circuit on tort law concepts such as ''negligent supervision'' and ''continuing negligence'' may be misplaced. The coverage offered by the insurance policy at issue in this case is governed, not necessarily by precepts of Oregon tort law, but rather as a threshold matter by the terms of the policy itself.

■    The method by which an insurance policy is to be construed has been discussed thoroughly by this court in the court's recent decision of *Hoffman Construction Co. v. Fred S. James & Co., supra.* We see no need to repeat that

---

[6] The parties have provided this court with copious citations to cases, both state and federal, as well as to other authorities, in support of their arguments as to how this court should determine the number of ''occurrences'' under the policy at issue. The five questions certified to this court by the Ninth Circuit carry on that theme. Case law and other authorities, however, are no substitute for a thorough examination of the policy in the first instance.

discussion here. We add to that discussion two points. First, we note that reference to precepts of Oregon tort law as a means of defining policy terms is appropriate only if the policy expressly or by clear inference implicates those precepts. Second, we note that, if the first six steps of the *Hoffman* methodology, *id.* at 474-75, fail to resolve an ambiguity in the meaning of the policy, what remains could be a factual issue — the parties' intent — as to which an award of summary judgment might be inappropriate.

We do not apply the *Hoffman* methodology to this insurance contract ourselves. To do so would exceed the scope of the questions certified to us by the Ninth Circuit and might invade that court's functions. The Ninth Circuit's questions do not indicate as a necessary predicate that that court has concluded that the terms of the policies expressly or by clear inference implicate the principles of Oregon tort law that an answer to the certified questions would consider. We thus answer all five certified questions with this single answer: The meaning of an insurance policy is to be resolved under the principles of interpretation announced by this court in *Hoffman Construction Co. v. Fred S. James & Co.*, 313 Or 464, 836 P2d 703 (1992). That meaning does not depend on the existence or scope of doctrines of Oregon tort law, unless the wording of a particular policy specifically or by clear inference implicates such doctrines.

Certified questions answered.

**UNIS, J.,** concurring in part and specially concurring in part.

I join in those portions of the opinion of the court that hold that the real question presented by this case is one of interpretation of the pertinent insurance contract and that the actual interpretation of that contract is a matter for the certifying court, not this court. I write separately to note my reservation on one point: The majority cites *Hoffman Construction Co. v. Fred S. James & Co.*, 313 Or 464, 836 P2d 703 (1992), as the template for the insurance contract analysis that the certifying court will be required to conduct. I did not participate in the *Hoffman Construction* decision, and I have reservations about its analysis. Those reservations are not pertinent to the court's disposition of this case, however. I

simply wish to note that, in some future case implicating the *Hoffman Construction* analysis, I reserve the right to urge the court to consider an alternative analytical approach.

With the foregoing qualification, I concur in the opinion of the court.