249 P.3d 148 (2011)
241 Or. App. 161
PORTLAND SCHOOL DISTRICT NO. 1J, an Oregon public school district, Plaintiff-Respondent,
v.
GREAT AMERICAN INSURANCE COMPANY, an Ohio corporation, Defendant-Appellant, and
Campbell, Galt & Newlands, Inc., an Oregon corporation, dba USI Northwest; and Whitecap Insurance, Inc., a Washington corporation, dba Countrywide Brokerage Services, Defendants.
061212536; A137057.
Court of Appeals of Oregon.
Argued and Submitted September 11, 2009.
Decided February 23, 2011.
*149 I. Franklin Hunsaker argued the cause for appellant. With him on the briefs were Peter Whalen, Kathryn Ashton, and Duane Morris LLP, California, and Sean W. Carney, and Prange Law Group, LLC.
D. Gary Christensen, Portland, argued the cause for respondent. With him on the brief were Jennifer J. Roof and Miller Nash LLP.
Before WOLLHEIM, Presiding Judge, and SERCOMBE, Judge, and DUNCAN, Judge.[*]
DUNCAN, J.
This case arises out of an insurance coverage dispute between defendant Great American Insurance Company (Great American), an excess insurer, and plaintiff Portland School District (the district), the assignee of Great American's insured. Great American appeals a limited judgment in favor of the district, assigning error to the trial court's grant of partial summary judgment for the district and denial of its own motion for summary judgment. The trial court determined that the insured's excess insurance policy with Great American did not incorporate an anti-assignment provision contained in the insured's underlying policy and, consequently, that the district as assignee could prevail on its claim for breach of contract against Great American. For the reasons explained below, we affirm.
In an appeal of a judgment resulting from cross-motions for summary judgment, where the defendant assigns error to both the denial of its motion and the granting of the plaintiff's motion, both are subject to review. Ellis v. Ferrellgas, L.P., 211 Or.App. 648, 652, 156 P.3d 136 (2007). Each moving party has the burden of demonstrating that there *150 are no issues of material fact and that the movant is entitled to judgment as a matter of law. Eden Gate, Inc. v. D & L Excavating and Trucking, Inc., 178 Or.App. 610, 622, 37 P.3d 233 (2002). We review the record for each motion in the light most favorable to the party opposing that motion. Id.
Here, the district and Great American agree that there are no disputed issues of fact and that their opposing motions turn on issues of law, specifically, the interpretation of an insurance contract and the applicability of a statute, ORS 31.825. We summarize the facts from those stipulated by the parties for purposes of their cross-motions for summary judgment.
The district hired a roofing contractor to replace the roof of a school. The contractor was negligent in its work, and, as a result, the roof caught fire. The contractor had a liability insurance contract (the underlying policy) with CNA Insurance Company (CNA), and an excess insurance contract (the excess policy) with Great American.[1] The amount of damage to the school exceeded the limits of the underlying policy. The contractor timely submitted claims to both CNA and Great American for coverage under the policies; Great American denied coverage.
Thereafter, the contractor, the district, and CNA entered into a settlement agreement. Pursuant to that agreement, CNA agreed to pay its policy limit of $1 million, and the contractor agreed to pay $50,000, to the district. The parties agreed that, within five days after execution of the agreement, the district would file a civil action for negligence against the contractor, seeking damages of $2,393,885.43, at which time the agreed-upon payments would be made. Upon collection of payment, the district then agreed to "release[] [the contractor] from claims of whatever kind or nature, whether known or unknown, that could be asserted against [the contractor] up to and including the first $1,050,000 of the total amount of [the district's] damages suffered as a result of the Fire" and that "[the district's] claims exceeding the first $1,050,000 of [the district's damages] are expressly reserved."
The agreement further provided that, within five days after the filing of the complaint against the contractor and the receipt of payment from CNA and the contractor, the district and the contractor would file a stipulated judgment against the contractor for $1,343,885.43, representing the district's remaining alleged damages. Finally, the parties agreed that, within five days after entry of the stipulated judgment, the contractor would assign its claims and rights against third parties, including Great American,[2] to the district in exchange for the district's agreement not to execute the judgment against it (the "Assignment of Claims and Covenant Not to Execute").
Those events occurred,[3] and, on the basis of the assignment of rights from the contractor, the district filed this action against Great American[4] for, among other claims, breach of the insurance contract. The parties subsequently filed cross-motions for summary judgment on the issue of Great American's liability on the district's breach of contract claim.
As relevant here, Great American argued that an anti-assignment clause in the underlying policy (set out below) was incorporated into Great American's excess policy, thus precluding assignment of the contractor's rights to the district without its consent under *151 Holloway v. Republic Indemnity Co. of America, 341 Or. 642, 147 P.3d 329 (2006). Relying on Stubblefield v. St. Paul Fire & Marine, 267 Or. 397, 517 P.2d 262 (1973), Great American further argued that, even presuming a valid assignment of the contractor's rights under the excess policy, because the settlement agreement released the contractor from any additional liability to the district beyond the amount it paid under the settlement, Great American consequently also has no obligation to the district.
In response, the district argued that (1) the excess policy does not incorporate the anti-assignment provision in the underlying policy; (2) the anti-assignment provision in any event is inconsistent with ORS 31.825 and, therefore, invalid; and (3) because the contractor's claims were not extinguished by the settlement agreement but expressly preserved by ORS 31.825, Great American's argument under Stubblefield fails as well.
The trial court agreed with the district that the anti-assignment provision in the underlying policy was not incorporated into the excess policy and, without further explanation, entered an order granting the district's motion for partial summary judgment and denying Great American's motion. A limited judgment was subsequently entered against Great American, which Great American now appeals.[5]
The central issue on appeal is whether, in light of the anti-assignment provision in the contractor's underlying policy with CNA, the district can maintain this action against Great American. That provision states: "Your rights and duties under this policy may not be transferred without our written consent except in the case of death of an individual named insured." The excess policy, in turn, includes a section entitled "COVERAGE," which provides, in part:
"We will pay on behalf of the Insured `loss' in excess of the Underlying Limits of Insurance shown in Item 5. of the Declarations, but only up to an amount not exceeding the Company's Limits of Insurance as shown in Item 4. of the Declarations. Except for the terms, conditions, definitions and exclusions of this policy, the coverage provided by this policy will follow the First Underlying Insurance Policy, as shown in Item 5. of the Declarations."[6]
(Capitalization omitted; emphasis added.) It is thus necessary for us to first determine whether, by virtue of the emphasized text (the disputed provision), the excess policy incorporates the anti-assignment clause of the underlying policy.
We review interpretations of insurance policies for errors of law. Hoffman Construction Co. v. Fred S. James & Co., 313 Or. 464, 469, 836 P.2d 703 (1992). As the Supreme Court recently reiterated, "the primary and governing rule" in doing so "is to ascertain the intention of the parties." Dewsnup v. Farmers Ins. Co., 349 Or. 33, 39-40, 239 P.3d 493 (2010) (internal quotation marks and brackets omitted).
"To that end, we examine the terms and conditions of the policy, Groshong v. Mutual of Enumclaw Ins. Co., 329 Or. 303, 307, 985 P.2d 1284 (1999) (citing Interstate Fire v. Archdiocese of Portland, 318 Or. 110, 117, 864 P.2d 346 (1993)), and where a particular term is not defined in the contract, we begin by identifying that term's plain meaning. Groshong, 329 Or. at 308 [985 P.2d 1284]. If the term has no plain meaning; that is, if the term is ambiguous, we examine that term within the context of the policy as a whole. Hoffman, 313 Or. at 470 [836 P.2d 703]. If two or more plausible interpretations still remain, we construe the term against the drafter and in favor of the insured. Id. at 470-71 [836 P.2d 703]."
Dewsnup, 349 Or. at 40, 239 P.3d 493.
Great American contends that the only plausible reading of the disputed provision demonstrates that the excess policy is a "follows-form" *152 contractthat is, that it "incorporates all the terms, conditions, definitions and exclusions of the underlying CNA insurance contract except for provisions that contradict language contained in Great American's own insurance contract." Because the excess policy does not address the assignment of rights, it thus follows, according to Great American, that the excess policy incorporates the anti-assignment clause from the underlying policy.
The district, on the other hand, interprets the provision to mean that the excess policy follows only the "coverage" section of the underlying policy, not its "terms, conditions, definitions and exclusions," such as the anti-assignment clause. In other words, in the district's view, the disputed text unambiguously provides that the "terms, conditions, definitions and exclusions" do not follow the underlying policy, but, rather, are determined solely by reference to the excess policy, which, as noted, does not itself preclude the assignment of rights.
As explained below, we conclude that the provision is ambiguous, that that ambiguity is not resolved by reference to the context of the policy as a whole, and, therefore, that the provision must be construed against its drafter, Great American. Dewsnup, 349 Or. at 39-40, 239 P.3d 493.
Following the methodology described above, "[w]e begin with the wording of the policy, applying any definitions that are supplied by the policy itself and otherwise presuming that words have their plain, ordinary meanings." Tualatin Valley Housing v. Truck Ins. Exchange, 208 Or.App. 155, 159, 144 P.3d 991 (2006), rev. den., 342 Or. 344, 153 P.3d 124 (2007). Once again, the pertinent wording reads:
"Except for the terms, conditions, definitions and exclusions of this policy, the coverage provided by this policy will follow the [underlying policy]."
None of the key words are defined in the policy itself; therefore, we look first to the plain meanings of those words.
The word "except," as used here, can mean "with the exclusion or exception of," Webster's Third New Int'l Dictionary 791 (unabridged ed. 2002); "exception," in turn, means "the act of excepting or excluding: exclusion or restriction (as of a class, statement, or rule) by taking out something that would otherwise be included," id. (emphasis added). Given that definition, the sentence could reasonably be understood to mean, as Great American asserts, that the excess policy follows the underlying policy, including its terms, conditions, definitions, and exclusionsprovisions that would otherwise be encompassed in "coverage"with the exception of those specific terms and conditions that are also contained in the excess policy itself. However, the word "except" can also mean "otherwise, elsewhere, or for other reason than: other than: BUT." Id. (Capitalization in original.) And that definition tends to support the district's readingthat is, that the excess policy follows the underlying coverage other than as to the terms, conditions, definitions, and exclusions that will govern that coverage, which terms will be supplied by the excess policy.
Reference to the ordinary meaning of the term "coverage" does nothing to clarify the provision's meaning in either direction. Great American's asserted construction of the provision requires that the word "coverage" necessarily encompasses policy terms, conditions, definitions, and exclusions. The district's reading, on the other hand, comprehends that "coverage" means something separate and apart from the policy's terms, conditions, definitions, and exclusionsspecifically, "coverage," according to the district, is the general categories of loss included in the policy (here, e.g., bodily injury and property damage, "personal and advertising" injury, and medical payments). Either reading is plausible under the relevant dictionary definitions of the word. Webster's at 524-25 (defining "coverage" as "protection by insurance policy: inclusion within the scope of a protective or beneficial plan," or the "aggregate of items covered as * * * the aggregate of risks covered by the terms of a contract of insurance").[7]Cf. Bergmann v. *153 Hutton, 337 Or. 596, 603-04, 101 P.3d 353 (2004) (meaning of words "this coverage" as used in ORS 742.504(7)(c) decipherable only by reference to its context).
The plain meaning of the provision is therefore ambiguous, and we turn to the context to determine if that ambiguity can be resolved. Groshong, 329 Or. at 312, 985 P.2d 1284 (second interpretive step entails "examin[ing] the phrase in light of `the particular context in which that phrase is used in the policy and the broader context of the policy as a whole'" (brackets in original omitted) (quoting Hoffman, 313 Or. at 470, 836 P.2d 703)). As context supporting its interpretation, the district points to the "Other Insurance" provision in the excess policy, which states:
"If other insurance applies to a `loss' that is also covered by this policy, this policy will apply excess of the other insurance. Nothing herein will be construed to make this policy subject to the terms, conditions and limitations of such other insurance. However, this provision will not apply if the other insurance is specifically written to be excess of this policy.
"Other insurance includes any type of self-insurance or other mechanism by which an insured arranges for funding of legal liabilities."
The district contends that the underlying policybecause it is a "mechanism" that the insured used to fund its legal liabilitiesfalls within the scope of "other insurance," and, as a result, the excess policy is expressly not subject to any of the terms and conditions of the underlying policy, including the anti-assignment clause. We disagree. Read in the context of the policy as a whole, it is plain that the underlying policywhich is specifically identified and consistently referred to throughout the excess policy as the "First Underlying Insurance Policy"is separate and distinct from the "other insurance" referred to in this provision.[8]
The district also points out that the underlying policy includes a specific section entitled "COVERAGES," which, among other things, defines and describes the various types of coverages provided by the policy, such as for bodily injury and property damages, as well as a separate and distinct section entitled "COMMON POLICY CONDITIONS," which includes the anti-assignment clause. Thus, according to the district, because the incorporation provision uses the term "coverage" to describe the particulars in which the excess policy will follow the underlying policy, it clearly indicates the policy's intent to incorporate the "COVERAGES" section of the underlying policy, and not the "COMMON POLICY CONDITIONS" section of that policy.
That position is persuasive up to a point. However, the "COVERAGES" section of the underlying policy also contains particular subsections labeled "Exclusions," undermining the district's argument that "terms, conditions, definitions and exclusions" are distinct from the policy's "coverage." Moreover, as Great American points out, the word "coverage" is also used broadly in both policies to refer generally to the *154 scope of benefits and rights provided by the insurance contract.
Other contextual clues, however, do provide support for the district's reading of the disputed provision. For example, the excess policy includes separate sections referring specifically to "CONDITIONS," "DEFINITIONS," and "EXCLUSIONS." Although the policy does not contain a separate "TERMS" section, that structure lends some credence to the district's view that the excess policy, rather than the underlying policy, provides the applicable "terms, conditions, definitions and exclusions." More significantly, the "exhaustion" provision of the excess policywhich appears on the same page of the policy as the disputed provision states that, under certain circumstances, if all limits of the underlying policy are exhausted,[9] the excess policy "will apply as underlying insurance subject to the same terms, conditions, definitions and exclusions of the [underlying policy], except for the terms, conditions, definitions and exclusions of [the excess policy]." (Emphasis added.) This suggests that Great American knew how to incorporate the terms and conditions of the underlying policy when it intended to do so. By using different phrasing in the provision at issue herethat is, by instead saying "[e]xcept for the terms, conditions, definitions and exclusions of this policy, the coverage provided by this policy will follow the [underlying policy]" (emphasis added)it is reasonable to assume that Great American intended something different. See Laird v. Allstate Ins. Co., 232 Or.App. 162, 171, 221 P.3d 780 (2009), rev. den., 348 Or. 414, 233 P.3d 817 (2010) (acknowledging the maxim of construction that "different words are presumed to have different meanings" in the context of insurance contract interpretation; rejecting application of that maxim where it would lead to a result that is not plausible from the perspective of an "`ordinary purchaser of insurance'" (quoting Totten v. New York Life Ins. Co., 298 Or. 765, 771, 696 P.2d 1082 (1985))).
In short, a contextual reading of the provision at issue here provides no definitive guidance as to whether the excess policy is intended to incorporate all of the particulars of the underlying policy (except those in conflict with the "terms, conditions, definitions and exclusions" of the excess policy), or whether all of the "terms, conditions, definitions and exclusions" would be supplied by the excess policy itself. As a result, the provision remains ambiguous. We, therefore, apply the rule that ambiguous terms are to be construed against the drafter and in favor of the insured. Dewsnup, 349 Or. at 40, 239 P.3d 493 (citing Hoffman, 313 Or. at 470-71, 836 P.2d 703). As the Supreme Court has explained:
"Ambiguity requires resort ultimately to [that rule] because, when two or more competing, plausible interpretations survive the kind of scrutiny described, the term still must `reasonably be given a broader or a narrower meaning, depending upon the intention of the parties in the context in which such words are used by them.' Shadbolt v. Farmers Insur. Exch., 275 Or. 407, 411, 551 P.2d 478 (1976); accord Joseph v. Utah Home Fire Ins. Co., 313 Or. 323, 330, 835 P.2d 885 (1992); Chalmers v. Oregon Auto. Ins. Co., 262 Or. 504, 509, 500 P.2d 258 (1972). That is, when two or more competing, plausible interpretations prove to be reasonable after all other methods for resolving the dispute over the meaning of particular words fail, then the rule of interpretation against the drafter of the language becomes applicable, because the ambiguity cannot be permitted to survive. It must be resolved."
Hoffman, 313 Or. at 470-71, 836 P.2d 703 (emphasis in original). Applying that rule here means that we construe the excess policy in favor of the district, that is, as not incorporating the anti-assignment provision contained in the underlying policy.[10] As the parties recognize, absent that incorporation, nothing in the excess policy prohibits the *155 contractor from assigning its rights under the policy to the district.
We turn, then, to Great American's alternative argument that, even if the assignment of rights was valid under the policy, the trial court erred in denying its motion for summary judgment under the holding of Stubblefield, 267 Or. 397, 517 P.2d 262. In Stubblefield, the plaintiff had, in a prior action, sued his wife's doctor for allegedly enticing the plaintiff's wife to engage in sexual intercourse with the doctor and with others in the doctor's presence (specifically, the claims were for "alienation of affections" and "criminal conversation"). Id. at 398, 517 P.2d 262. The doctor was insured by the defendant, who refused to defend. The plaintiff and the doctor then entered into a settlement agreement, "under which a judgment for $50,000 was entered against [the doctor], but with a prior `covenant not to execute' against the [doctor] for any amount in excess of $5,000." Id. In exchange, the doctor executed an assignment to the plaintiff of all claims in excess of that amount that he had against the defendant insurance company; the plaintiff subsequently filed an action against the defendant based on those claims. Id. The Supreme Court held that, because the defendant was required to indemnify the doctor only for the amount that the doctor was "legally obligated to pay" and the covenant not to execute the judgment had extinguished the doctor's liability to the plaintiff above $5,000which amount was expressly excluded by the assignmentthere was nothing to assign. Id. at 400-01, 517 P.2d 262 (emphasis omitted). In other words, the purported assignment transferred no enforceable rights against the defendant to the plaintiff.
Great American argues that the present case is materially indistinguishablethat is, the district made a claim against the contractor;[11] the insurer, Great American, denied coverage; the district entered into a settlement agreement with the contractor; under that agreement, a stipulated judgment was entered against the contractor for a specified amount of damages, and the district agreed not to execute that judgment in exchange for the contractor assigning to the district its rights and claims against Great American. Thus, in Great American's view, just as in Stubblefield, the contractor had no legal liability to the district for the judgment and, consequently, under Stubblefield, neither does Great American.
The district remonstrates that Stubblefield is inapplicable in light of ORS 31.825, enacted after Stubblefield was decided, and under which the contractor's claims against Great American were expressly preserved and validly assigned to the district. We agree with the district.
ORS 31.825 provides:
"A defendant in a tort action against whom a judgment has been rendered may assign any cause of action that defendant has against the defendant's insurer as a result of the judgment to the plaintiff in whose favor the judgment has been entered. That assignment and any release or covenant given for the assignment shall not extinguish the cause of action against the insurer unless the assignment specifically so provides."
Thus, the statute expressly permits a defendant in a tort action who has received an adverse judgment to assign to the plaintiff in that action any cause of action that the defendant has against the defendant's insurer as a result of the judgment. Here, at the time the district and the contractor entered into the "Assignment of Claims and Covenant Not to Execute" the contractor was the defendant in an action for negligence brought by the district, and a judgment in favor of the district had been entered in that case. As a result of that judgment, the contractor had a cause of action against Great American for breach of the insurance contract, which the contractor then assigned to the district.
Moreover, the second sentence of the statute makes clear that the assignmentand any "release or covenant" given in exchangedoes *156 not, unless the assignment specifically provides otherwise, extinguish the claims against the insurer. Here, the "Assignment of Claims and Covenant Not to Execute" did not specify the elimination of claims against Great American, but, instead, expressly preserved them.[12]
Great American, however, contends that the statute does not apply because the assignment and release were agreed to in the settlement agreementthat is, before any suit was filed against the contractor. Therefore, according to Great American, the defendant was not "a defendant in a tort action," and the contractor did not have any "cause of action" against Great American "as a result of the judgment." Rather, in Great American's view, the district "fully compromised its claim against [the contractor] prior to the entry of the stipulated judgment" (emphasis in original), thus, the statute is inapposite and, consistently with Stubblefield, Great American has no liability to the district.
The problem with Great American's argument is that, under the terms of the settlement agreement, the district's release of the contractor from claims in excess of $1,050,000although anticipated in the agreementwas conditioned upon the filing of a tort action and entry of judgment against the contractor. To briefly recap that agreement: The parties agreed that the district would file an action for negligence against the contractor after the settlement agreement was executed and that, within five days after that filing and the district's collection of payment of $1,050,000 ($50,000 from the contractor and $1,000,000 from CNA), the district and the contractor would file a stipulated judgment against the contractor for the district's damages in excess of that amount. The agreement then provided that, "within five business days after the stipulated judgment is entered, [the contractor] and [the district] will execute an assignment agreement and covenant not to execute in the form attached [the Assignment of Claims and Covenant Not to Execute]." Thus, until the stipulated judgment was entered, the district had no enforceable right to assignment and the contractor had no enforceable right to release from liability to the district. Moreover, the agreement expressly provided that the district reserved its claims against the contractor (in excess of the $1,050,000 that the contractor and CNA agreed to pay). See 241 Or.App. at 163-65, 249 P.3d at 150. In other words, contrary to Great American's position, the district did not "fully compromise its claims" against the contractor until the "Assignment of Claims and Covenant Not to Execute" was executed. And, at that time, the contractor plainly was a "defendant in a tort action against whom a judgment ha[d] been rendered" who had a cause of action against its insurer as a result of that judgment. Thus, under the plain meaning of ORS 31.825, the contractor was free to assign that cause of action to the district.
To summarize, we conclude that the excess policy does not prohibit the assignment of the contractors' rights under that policy to the district. We further conclude that that assignment was valid under ORS 31.825 and, consequently, that the district, as assignee, prevails in its claim for breach of contract against Great American. Accordingly, the trial court did not err in entering partial summary judgment for the district or in denying Great American's motion for summary judgment.
Affirmed.
NOTES
[*] Duncan, J., vice Edmonds, P.J.
[1] The underlying policy had the following limits: $1 million per occurrence, $2 million products/completed operations aggregate, and $2 million general aggregate. The excess policy had limits of $4 million per occurrence with $4 million aggregate.
[2] The contractor reserved its right to collect against Great American for the $50,000 it agreed to pay to the district.
[3] It appears, however, that the stipulated general judgment that was actually entered against the contractor was in the amount of $1,172,639, rather than $1,343,885.43, as was contemplated in the settlement agreement. Neither party argues that that disparity has any significance to the issues on appeal.
[4] The district also named the contractor's insurance agents as defendants, claiming negligent procurement of insurance. Those parties were not involved in the motions for summary judgment and are not parties to this appeal.
[5] Following the trial court's order on summary judgment, the parties stipulated to entry of judgment against Great American for the principal amount of $1,172,639, with Great American reserving its right to appeal the court's summary judgment ruling.
[6] It is undisputed that Item 5. of the Declarations refers to the underlying policy.
[7] Although the parties do not emphasize it, one additional term also deserves brief mentionthat is, the word "follow"as in the phrase "coverage * * * will follow." In Great American's view, that term indicates that the excess policy is written on a "follows-form" basisa term of art meaning that it "`incorporates by reference the terms of the underlying policy and is designed to match the coverage provided by the underlying policy,'" except as to matters addressed in the excess policy itself. (Quoting Eric Mills Holmes, Interim Vol. 23, Appleman On Insurance 2d, § 145.1, 6 (2003).) See also Black's Law Dictionary 877 (9th ed. 2009) (a "following-form policy" "adopts the terms and conditions of another insurance policy"). Even assuming that understanding of "follows-form" insurance contracts, the provision written into the excess policy here is insufficientgiven our analytical method for construing insurance contractsto unambiguously establish that it was intended to carry that meaning. Hoffman, 313 Or. at 469, 836 P.2d 703 (in interpreting an insurance contract, we must determine the intent of the parties "based on the terms and conditions" of the policy). Instead, consistently with the district's argument, "follow" could mean that the excess policy incorporates some, but not all, of the provisions in the underlying policy.
[8] Reading it instead as the district argues would make other provisions of the excess policy meaningless, including, to some extent, the very provision we are construing here (under the district's asserted understanding of it), and the "exhaustion" provision contained in section II.B.4 of the policy. See Hoffman, 313 Or. at 472, 836 P.2d 703 ("We assume that parties to an insurance contract do not create meaningless provisions.").
[9] Those circumstances do not apply in this case.
[10] That conclusion obviates the need to address Great American's argument that, under Holloway, the incorporated anti-assignment provision precludes the district from recovering against Great American.
[11] Unlike in Stubblefield, however, no legal action was filed until after the settlement agreement was executed.
[12] Section 3.c. of the document states,

"The releases provided in this Assignment are personal to [the contractor] and [the district] and shall not impair or impede (1) [the district's] ability to pursue or collect on the Claims from third parties, including Great American * * *, or (2) [the contractor's] ability to pursue or collect from third parties indemnification for amounts that [the contractor] has paid to [the district] to secure these releases."