Argued and submitted January 21, affirmed July 1, 2009

Beth DEWSNUP
and Tim Dewsnup,
*Plaintiffs-Appellants,*

*v.*

FARMERS INSURANCE COMPANY
OF OREGON,
*Defendant-Respondent.*

Douglas County Circuit Court
06CV4790CC; A136394

211 P3d 354

Robert E.L. Bonaparte argued the cause for appellants. With him on the briefs was Shenker & Bonaparte, LLP.

Francis J. Maloney III argued the cause for respondent. With him on the brief were Beth Cupani and Bullivant Houser Bailey PC.

Before Landau, Presiding Judge, and Schuman, Judge, and Ortega, Judge.

LANDAU, P. J.

## LANDAU, P. J.

Plaintiffs Beth and Tim Dewsnup appeal a judgment for defendant Farmers Insurance Company after the trial court granted defendant's motion for summary judgment on plaintiffs' claims seeking coverage for water damage to their home under their homeowners insurance policy. We affirm, although on a ground different from the one on which the trial court relied.

The relevant facts are uncontested. Plaintiffs owned a house. They insured their house under a policy with defendant. Like so many insurance policies, plaintiffs' in this case was drafted in terms of what is covered, then what is excluded from coverage, followed by what is excepted from the exclusions, and concluding with—stay with us here— what is excepted from the exclusions from the exceptions from coverage. We describe the precise terms of the policy later in this opinion. At this juncture, it suffices to say that the policy provides coverage for plaintiffs' "dwelling." The policy does not define the term "dwelling," but it does describe plaintiffs' property as a "frame house" with a "wood shingle or shake" roof type (it is apparently undisputed that the roof was actually shake).[1] The policy excludes "water damage." It then excepts from the water damage exclusion loss or damage to the interior of the dwelling or to personal property in the dwelling if the loss or damage is caused by a windstorm or a "falling object." It concludes by providing that the exception to the water damage exclusion applies only if the loss results from damage to the "roof."

In 2006, the shake roof began to deteriorate. In June of that year, plaintiff Tim Dewsnup—who happened to be a contractor—undertook to replace the shakes. On the first day of work, he removed the old shakes down to the plywood sub-roof layer. He then covered the plywood with a sheet of poly-ethylene plastic, secured to the plywood with half-inch staples in the center and one-inch-by-two-inch bats nailed with eight penny nails on the sides. He did the work in a work-manlike manner.

---

[1] Shakes and shingles are types of roofing material made of edge-grain cut wood. Shakes are made by splitting the wood, while shingles are sawn.

On the second day, a storm with high winds arose and ripped one sheet of plastic away, allowing rain to enter the house through the joints at the intersections of the plywood sheets. Tim went up onto the roof to repair the plastic sheet. While adding an additional sheet, he lost his footing and fell off the roof, ripping off all the sheets of plastic as he fell and injuring his back. Because of his injury, Tim was unable to return to the roof that day to replace the plastic sheets, and the rain continued to come in through the plywood joints, causing considerable damage to the interior of the house and to plaintiffs' personal property.

Plaintiffs filed a claim under their homeowners insurance policy. Defendant denied the claim, contending that the loss was caused by water damage. Plaintiffs then initiated this action for breach of the insurance policy. Defendant moved for summary judgment, arguing that the undisputed facts show that the water damage exclusion applies. Plaintiffs responded that the water damage exclusion does not apply, because their loss or damage resulted from either a windstorm or a falling object—Tim himself being the object. Defendant replied that the exceptions to the water damage exclusion do not apply, because both require that either the windstorm or the falling object damage the "roof," and a sheet of plastic is not a "roof."

The trial court did not address any of the parties' contentions. Instead, the court concluded that the policy does not apply because, when plaintiffs took off the shake roof and replaced it with the temporary plastic covering, the structure ceased to be the "dwelling" that was insured under the policy. The house, the court explained, was no longer the "dwelling" that the parties had agreed to insure.

Plaintiffs appeal, arguing that the trial court erred in concluding that, merely because they altered the type of roofing material, their house suddenly ceased to be an insured "dwelling" under the policy. According to plaintiffs, the trial court should have concluded that, as a matter of law, their loss was caused by either a windstorm or a falling object, which would establish coverage under the policy.

Defendant contends—if briefly—that the trial court correctly concluded that the removal of the shake roof transformed the house into something other than an insured "dwelling" under the policy. In the event we do not agree, however, defendant offers several alternative bases for affirming the trial court's bottom-line decision that plaintiffs' loss or damage is not covered under the policy. One of those bases is that both of the exceptions to the water damage exclusion—for windstorms or falling objects—apply only when there is damage to the "roof." According to defendant, the ordinary meaning of "roof" is an outside cover of a building consisting of "roofing" material, which, in turn, refers to a covering that is a permanent part of the structure, usually made of slate, wood, or metal. A sheet of plastic stapled to the top of a house, defendant contends, is not a "roof."

Plaintiffs reply that the plastic was secured in a way that made it "functionally permanent." As a result, they contend, the damage to the plastic sheets did constitute damage to their "roof" within the meaning of the policy.

■■ The parties' arguments concern the proper interpretation of an insurance policy, which is a question of law. *Hoffman Construction Co. v. Fred S. James & Co.*, 313 Or 464, 469-71, 836 P2d 703 (1992). When we interpret an insurance policy, our goal is to ascertain the intention of the parties. *Holloway v. Republic Indemnity Co. of America*, 341 Or 642, 649, 147 P3d 329 (2006). We determine the parties' intentions from the terms and conditions of the policy itself. *Groshong v. Mutual of Enumclaw Ins. Co.*, 329 Or 303, 307, 985 P2d 1284 (1999).

In the absence of a policy definition of relevant terms, we "resort to various aids of interpretation to discern the parties' intended meaning." *Id.* at 307-08. One such "aid" is the determination whether the relevant terms have a "plain meaning," *id.* at 308, determined by reference to the usual source of ordinary meaning, the dictionary, *Smith v. State Farm Ins.*, 144 Or App 442, 447, 927 P2d 111 (1996). If a term has a plain meaning—that is, if it "is susceptible to only one plausible interpretation," *Groshong*, 329 Or at 308—we will apply that meaning and conduct no further analysis.

*Id.* If, however, the term has more than one plausible interpretation, we will "examine the phrase in light of 'the particular context in which that [term] is used in the policy and the broader context of the policy as a whole.' " *Id.* at 312 (quoting *Hoffman Construction Co.*, 313 Or at 470). If a term remains ambiguous—that is, if two or more plausible interpretations continue to be reasonable, *Hoffman Construction Co.*, 313 Or at 470—we will interpret the provision against the insurance company and in favor of coverage. *North Pacific Ins. Co. v. Hamilton*, 332 Or 20, 25, 22 P3d 739 (2001).

■    We begin with the trial court's conclusion that, when plaintiffs tore off the shake roofing, their house ceased to be an insured "dwelling" within the meaning of the policy. The policy covers "[t]he dwelling * * * on the **residence premises** used principally as your private residence." (Boldface in original.) The policy defines "resident premises" as

> "the one or two family dwelling and separate structures or that part of any other building where you reside, and which is shown in the Declarations. Under Section II—Liability, **residence premises** includes the grounds on which the dwelling and separate structures are located."

(Boldface in original.) The Declarations page, in turn, contains a description of the property: "Year of Construction: 1980; Construction Type: Frame; Roof Type: Wood Shingle or Shake; Number of Units: 001; Occupancy: Owner." We note also that Policy Condition 10 provides: "You may make alterations, additions, and repairs to the **residence premises** and complete structures under construction." (Boldface in original.)

The policy does not define the term "dwelling." The ordinary meaning of the term is "a building or construction used for residence." *Webster's Third New Int'l Dictionary* 706 (unabridged ed 2002). There appears to be no dispute that plaintiffs' home was a building used for residence and that it was located on the "residence premises." Nothing in the record suggests that, by removing the deteriorating shake roofing, the building was any less a building, that it ceased to be used for residence, or that it no longer was located on the "residence premises." It would seem necessarily to follow that, even though plaintiffs removed the roofing material

from their house, by doing so, they did not make that house any less a "dwelling" within the meaning of the policy.

As we understand it, the trial court's reasoning was not that taking the shakes off of the roof changed plaintiffs' house into something other than a "dwelling"; rather, it was that doing so changed the house into something other than *the* dwelling that was the subject of the insurance policy at issue, based on the fact that the policy described the house as having "wood shingle or shake" roofing. The fact that the policy *described* the premises as having certain features, however, does not necessarily mean that maintaining those features is a *condition of coverage*. If, for example, the policy happened to describe the house as having been painted white, the fact that the owners later decided to paint it yellow would not mean that the house would no longer be covered.

Treating the temporary removal of the shakes as transforming the house into something other than a covered "dwelling" is especially difficult to reconcile with the portion of the policy that expressly authorizes the policyholders to "make alterations, additions, and repairs to the residence premises and complete structures under construction." Nothing in the wording of that provision suggests that repairing a roof is not included among the "alterations, additions, and repairs" that are expressly authorized. It is not immediately apparent to us how a roof repair is physically possible without removing some or all of the existing roof. Under the trial court's reading of the policy, doing precisely that transforms the house into an uninsured building, something other than the "dwelling" that it was before the repairs. Under the interpretive principles that we have described, a plausible reading of an insurance policy provision must make sense in light of "the broader context of the policy as a whole." *Hoffman Construction Co.*, 313 Or at 470. The trial court's reading of the policy founders against that principle of interpretation.

That does not necessarily mean that the trial court erred in granting defendant its motion for summary judgment. Defendant offers other bases for affirming the court's decision as a matter of law. We therefore turn our attention to one of those alternative bases, which we conclude does lead to an affirmance of the court's decision.

The policy excludes coverage for water damage, except for "loss or damage to the interior of any dwelling or separate structures, or the personal property inside the dwelling or separate structures caused by water damage, if the dwelling or separate structures first sustained loss or damage caused by" certain perils listed in the policy under "SECTION I—LOSSES INSURED—Coverage C—Personal Property." Plaintiffs assert that their loss was caused by either one of two perils described in Coverage C. The first peril is "Windstorm or hail." The policy states:

> "This peril does not include loss to the property contained in a building if the loss is caused by rain, snow, sleet, sand or dust *unless the direct force of wind or hail damages the building causing an opening in a roof or wall and the rain, snow, sleet, sand or dust enters through this opening.*"

(Emphasis added.) The second peril is "Falling Objects." The policy states:

> "This peril does not include loss to property contained in a building unless the roof or an outside wall of the building is first damaged by a falling object."

The first peril requires that "direct force" of wind or hail damage the building, causing an opening in a "roof." The second peril requires that a falling object damage the "roof" or outside wall of the building.

Plaintiffs contend that both perils occurred in this case. According to plaintiffs, both wind and a falling object—plaintiff Tim Dewsnup being the "object"—caused an opening or other damage to the plastic sheets that covered the house, which plaintiffs insist constituted damage to the "roof." The plastic sheeting, plaintiffs argue, was itself the "roof" within the meaning of the policy. Defendant contends that what was in essence a plastic tarp is not a "roof" under any ordinary definition of the term.

Resolving that dispute requires us to determine the meaning of the term "roof" under the policy. The policy itself does not define the term. The ordinary meaning of the term is "the outside cover of a building or structure including the

roofing and all materials and construction necessary to maintain the cover upon its walls or other support[.]" *Webster's* at 1971. "Roofing," in turn, means

> "a material used or suitable for the construction of a roof; *specif* : a material designed for application to a roof as protection from the weather ‹slate ↝ ‹aluminum ↝ ‹mineral-surfaced ↝[.]"

*Id.* As defined, "roofing" is the outermost layer of the cover of a building and consists of materials that are suitable *for construction* and for application to a roof as protection from the weather. Nothing in the policy suggests that the term was intended to mean anything different from that ordinary, plain meaning.

Under that definition of the term, a temporary, plastic sheet covering a plywood subroof is not, itself, a "roof" or part of the roof. And damage to that plastic sheet would not constitute damage to the "roof" of the house. Such plastic might be understood to cover the roof, but in no reasonable sense would the sheet of plastic constitute the roof itself. If someone attempted to sell a house that was covered by such a plastic sheet, we doubt that any reasonable buyer would believe that he or she was buying a house that had a "roof." (Most likely, the buyer would say, "Where's the roof?")

We note that we are not the first appellate court to address this very issue and are not the first to come to the same conclusion. The policy provision is apparently fairly standard and has occasioned a number of appellate court decisions concerning its meaning. Nearly all—all but one, as far as we can tell—conclude that damage to a temporary plastic tarp covering a house is not damage to its "roof."

In *Diep v. California Fair Plan Ass'n*, 15 Cal App 4th 1205, 19 Cal Rptr 2d 591 (1993), for example, the question was whether damage to plastic sheeting that had been used to cover an exposed building top constituted damage to the building's "roof" within the meaning of an insurance policy. The California court answered the question in the negative, explaining that

> "a roof is commonly considered to be a permanent part of the structure it covers. 'Roof' is not an ambiguous or vague

word. The plastic sheeting was used here because part of the roof had been removed. The breach in the roof was not caused by wind or hail, but by the workmen who removed that portion of the roof needing repair."

*Id.* at 1208-09, 19 Cal Rptr 2d at 593.

Similarly, in *Camden Fire Ins. Ass'n v. New Buena Vista Hotel Co.*, 199 Miss 585, 24 So 2d 848 (1946), a rainstorm caused damage to some roofing felt that had been applied to a roof during repair. The damaged felt led to water damage to the interior of the building. Insurance coverage for the damage to the interior depended on whether the storm damaged the "roof" of the building. The court concluded that damage to the felt that had covered the roof was not damage to the roof itself. The court explained that

"a reasonably prudent householder would [not] consider it, if left in that condition for a month or months, or longer, as adequate against all risks of wind and rain which could be reasonably anticipated as likely to happen according to the general and recurrent experiences of the past—but not including any extraordinary or unprecedented eventuality."

*Id.* at 596-97, 24 So 2d at 850.

More recently, and closer to home, in *Aginsky v. Farmers Insurance Exchange*, 409 F Supp 2d 1230 (D Or 2005), the owner of an apartment building decided to install a new roof. The contractor removed the roof of the building, but the project then stalled. In the interim, a temporary tarp structure replaced the roof. A rainstorm followed, which penetrated the plastic tarp and damaged the building's interior. The owner claimed coverage based on a policy provision nearly identical to the one at issue in this case. The insurer denied the claim because there had been no damage to the "roof." The court agreed, explaining:

"A 'roof' is a permanent structure, according to its commonly understood meaning, and is not an ambiguous term. A temporary structure consisting of wooden framing and a plastic tarp would not be considered a 'roof' by any reasonable person. The policy language anticipates coverage of a completed, permanent roof, not one in the process of repair

and temporarily covered awaiting completion of the repairs."

*Id.* at 1236.

In *Victory Peach Group, Inc. v. Greater New York Mutual Ins. Co.*, 310 NJ Super 82, 707 A2d 1383 (1998), a New Jersey appellate court reached a different conclusion as to whether wind-caused damage to a temporary plastic tarp covering a building's roof constitutes damage to the "roof" itself within the meaning of an insurance policy exclusion. The court acknowledged *Camden* and *Diep*, but distinguished them. The court explained that New Jersey rules pertaining to the interpretation of insurance policies require the courts to "favor broad reading of coverage provisions and narrow reading of exclusionary provisions." *Id.* at 89-90, 707 A2d at 1386. Oregon rules of interpretation, of course, are different, requiring construction against the insurer only in the case of an unresolvable ambiguity. *Hoffman Construction Co.*, 313 Or at 470.

We conclude that the term "roof" has an unambiguous meaning, and that it does not include the tarps that plaintiffs placed over the house while the shakes were being replaced. A plastic tarp stapled into place would not plausibly be considered a "roof" or even part of the construction of a roof. Accordingly, the tarps that were damaged or blown away by wind and as a result of plaintiff Tim Dewsnup's fall were not themselves the house's "roof." They were simply a temporary protective cover for the roof.

Plaintiffs do not contend that if the tarps were not a part of the roof they were otherwise a part of the building so as to be encompassed within the first peril. Because the tarps were not a part of the roof, damage to the tarps does not bring plaintiffs' loss within one of the two listed perils described in the policy as exceptions to the exclusion for water damage. For that reason, we conclude that the trial court did not err in granting defendant's motion for summary judgment.

Affirmed.