Argued and submitted June 8, decision of Court of Appeals reversed; judgment of circuit court reversed, and case remanded to circuit court for further proceedings September 16, 2010

## Beth DEWSNUP
## and Tim Dewsnup,
### *Petitioners on Review,*

*v.*

## FARMERS INSURANCE COMPANY
## OF OREGON,
### *Respondent on Review.*

## (CC 06CV4790CC; CA A136394; SC S057895)

239 P3d 493

Kathryn H. Clarke, Portland, argued the cause and filed the brief for petitioners on review. With her on the brief was Robert E.L. Bonaparte.

Beth Cupani, Maloney Lauerdorf Reiner PC, Portland, argued the cause and filed the brief for respondent on review. With her on the brief was Francis J. Maloney III.

KISTLER, J.

Balmer, J., filed a dissenting opinion, in which Linder, J., joined.

## KISTLER, J.

The primary question in this case is what is a "roof" within the meaning of plaintiffs' homeowners' insurance policy. Plaintiffs Beth and Tim Dewsnup sustained losses due to water damage while their roof was undergoing repair. Although their insurance policy generally excludes coverage for water damage, they contended that an exception to that exclusion applies. The trial court ruled otherwise on defendant's motion for summary judgment, and the Court of Appeals affirmed. *Dewsnup v. Farmers Ins. Co.*, 229 Or App 314, 324, 211 P3d 354 (2009). The Court of Appeals reasoned that the exception to the water damage exclusion did not apply because, at the time of the loss, plaintiffs' roof was not a "roof" within the meaning of the policy. *Id.* In particular, the court held that a "roof," by its ordinary definition, is permanent, and because plaintiffs' roof was undergoing repair at the time of the loss, no permanent roof was in place to which the exception could apply. *Id.* We allowed plaintiffs' petition for review and now reverse the Court of Appeals decision and the trial court's judgment.

Because this case arises on defendant's motion for summary judgment, we state the facts in the light most favorable to plaintiffs. *Bergmann v. Hutton*, 337 Or 596, 599, 101 P3d 353 (2004). Plaintiffs' roof, which consisted of a plywood sublayer and an outer layer of wood shakes, was in need of repair. Plaintiff Tim Dewsnup is a contractor and took it upon himself to perform the repairs. In doing so, he removed the layer of wood shakes in its entirety, replacing it with a layer of six-mil-thick polyethylene plastic that completely covered the plywood sublayer beneath.[1] The polyethylene sheets[2] were secured to the plywood sublayer with one-half-inch long T-50 staples located at the center of each sheet.

---

[1] The expert's affidavit states that the polyethylene plastic was "six millimeter[s] thick," but defendant noted at oral argument that this measurement should read "six mil." A "mil" is a unit of measurement commonly used to measure the thickness of plastic sheeting. One mil is equal to one one-thousandth of one inch. The question whether the plastic was six mils or six millimeters thick is not essential to resolving the issue on review.

[2] The record indicates that the polyethylene plastic layer was composed of multiple sheets that, when placed adjacent to one another, completely covered the plywood sublayer. Specifically, the exhibit attached to plaintiffs' expert's affidavit contains a diagram showing that three sheets were used to cover the sublayer completely.

The edges of the polyethylene layer were secured with roof tacks driven through plastic washers to prevent tearing. The edges were further secured with wooden bats spaced at 24 to 30 inches on center. According to plaintiffs' expert, the polyethylene sheets were secured in such a way that they "would have been adequate to protect [plaintiffs'] home for one or two years if necessary under normal circumstances."

On the first night of plaintiffs' roof repair project, a storm moved through the area. Rising winds caused part of the polyethylene sheeting to loosen and eventually blow away. Tim Dewsnup attempted to replace the sheeting but, in doing so, fell off of the house, taking one or more of the plastic sheets with him to the ground. Dewsnup injured himself when he fell. While he was injured and unable to secure the sheets over the now-exposed areas of the plywood sublayer, rain began to enter the home through the joints in the sublayer. The rain caused water damage to plaintiffs' personal property inside the home, for which plaintiffs filed an insurance claim. Defendant denied the claim on the ground that water damage was excluded under plaintiffs' policy.

Plaintiffs brought an action in the trial court for breach of contract. In response, defendant moved for summary judgment, claiming that plaintiffs' insurance policy excluded loss resulting from water damage. Defendant reasoned that water damage is generally excluded except when a windstorm or hail creates an opening in a roof. Defendant contended that, because the polyethylene "tarp" was not a "roof," the policy did not cover plaintiffs' water damage. Alternatively, defendant argued that, to the extent that the plastic tarp could be considered a "roof," the loss resulted from "faulty or inadequate workmanship" and was, for that reason, also excluded from coverage under the policy.

The trial court granted defendant's summary judgment motion. Rather than doing so on the grounds set forth by defendant, the court interpreted plaintiffs' insurance policy to cover only the "dwelling" described in the policy declarations; that is, a dwelling of "frame" construction with a "wood shingle or shake" roof. According to the trial court, at the moment plaintiffs removed the wood shakes, the building was no longer the "dwelling" insured under the policy. As a

result, coverage was not merely excluded under the circumstances; coverage simply did not exist. The trial court accordingly entered judgment in defendant's favor.

On appeal, the Court of Appeals rejected the trial court's conclusion that, by removing the wood shakes, the entire structure was no longer insured under the policy. The court reasoned that no plausible interpretation of the insurance policy supported such a conclusion, pointing out that "[i]f, for example, the policy happened to describe the house as having been painted white, the fact that the owners later decided to paint it yellow would not mean that the house would no longer be covered." *Dewsnup*, 229 Or App at 320. The Court of Appeals reasoned that the policy declarations should not be construed as "condition[s] of coverage." *Id.* (emphasis omitted).

The Court of Appeals nevertheless affirmed the trial court's judgment, holding that "in no reasonable sense would the sheet of plastic constitute [a] roof." *Id.* at 322. Noting that the policy did not define the term "roof," the court looked to the ordinary meaning of the terms "roof" and "roofing" and determined that, "[a]s defined, 'roofing' is the outermost layer of the cover of a building and consists of materials that are suitable for construction and for application to a roof as protection from the weather." *Id.* at 321-22 (emphasis omitted). According to the court, "a *temporary*, plastic sheet * * * is not, itself, a 'roof' or part of the roof," *id.* (emphasis added); rather, the sheet was simply a temporary protective covering in place of an actual roof, and therefore, the loss was not covered. Because the court found its definition of "roof" dispositive, it did not address defendant's alternative grounds for affirming the trial court's grant of summary judgment.

We allowed plaintiffs' petition for review to consider what constitutes a "roof" within the meaning of plaintiffs' insurance policy and whether, viewing the facts in the light most favorable to plaintiffs, a reasonable juror could find that plaintiffs' roof came within that definition. We begin with the meaning of the term "roof" in plaintiffs' policy.

The insurance policy at issue here, like other insurance policies, is organized in terms of coverages and exclusions; in this policy, the coverage clauses bring certain property within the protection of the policy, while the exclusion

clauses deny protection to property that, but for the circumstances to which the particular exclusion applies, would otherwise be covered. *See Cimarron Ins. Co. v. Travelers Ins. Co.*, 224 Or 57, 61, 355 P2d 742 (1960) (distinguishing coverage and exclusion clauses in the context of an automobile insurance policy). The policy also contains exceptions to the exclusions and specifies the particular circumstances in which those exceptions apply. Generally speaking, this case turns on an interpretation of one specific exception to the policy's exclusion of water damage from general coverage. For the sake of clarity, we begin by describing the content of the policy in terms of its organizational structure.

The general coverage clauses in plaintiffs' insurance policy are found in the section entitled "LOSSES INSURED." These clauses extend coverage to plaintiffs' "[d]welling," to "[s]eparate structures," and to certain personal property located within the dwelling or separate structures. Exclusions from that coverage are listed in the section entitled "SECTION I—LOSSES NOT INSURED." The policy excludes coverage for water damage, but provides exceptions to that exclusion. It states, in part:

"Whenever water damage occurs, the resulting loss is always excluded under this policy, however caused; except we do cover:

"* * * * *

"2. Loss or damage to the interior of any dwelling or separate structures, or to personal property inside the dwelling or separate structures caused by water damage if the dwelling or separate structures first sustain loss or damage caused by a peril described under SECTION I—LOSSES INSURED —Coverage C—Personal Property."

The perils described under "SECTION I—LOSSES INSURED—Coverage C—Personal Property" include "[w]indstorm or hail."[3] Where "loss to property contained in a

---

[3] "SECTION I—LOSSES INSURED—Coverage C—Personal Property" provides coverage for a second peril that plaintiffs assert also applies here: "Falling objects." The "[f]alling objects" clause generally excludes coverage to personal property unless "the roof * * * is first damaged by a falling object." Plaintiffs argue that Tim Dewsnup was a "falling object" when he fell from the roof, pulling a portion of

building" is sustained, as is the case here, coverage is limited to situations where "the direct force of wind or hail damages the building causing an opening in a *roof* or wall and the rain, snow, sleet, sand or dust enters through this opening." (Emphasis added.)

The practical effect of this string of coverages, exclusions, and exceptions is that, for coverage to extend to water damage, the "direct force of wind or hail" must first damage a building by causing an opening in a roof. Only if rain enters the building through that opening and causes damage to personal property contained in the building will the policy cover that loss. It necessarily follows, and the parties agree, that the building must first have a "roof" in order for the exception to the water damage exclusion to apply. That raises the question: What is a "roof?"—a question that entails two related but separate issues. First, what is the meaning of the term "roof," as used in plaintiffs' insurance policy? Second, could an objectively reasonable juror, viewing the facts in the light most favorable to plaintiffs, find that the condition of the plaintiffs' roof at the time of the water damage came within that definition?

On the first issue, plaintiffs contend that, contrary to the Court of Appeals' conclusion, the plain meaning of the term "roof" does not include a durational component. More specifically, plaintiffs argue that nothing in the definition of "roof" requires that it be permanent. On that point, plaintiffs note that the policy expressly authorized them to "make * * * repairs to the residence" and that the Court of Appeals' reasoning would effectively read that authorization out of the policy. Defendant, on the other hand, contends that a "roof" must be permanent and relies on three cases to support that contention. Defendant argues alternatively that polyethylene plastic sheeting cannot, as a matter of law, constitute a roof.

In interpreting the meaning of an insurance policy, " '[t]he primary and governing rule * * * is to ascertain the

the polyethylene sheeting with him. Defendant moved for summary judgment on the ground that plaintiff's roof, while under repair, was not a roof within the meaning of the policy. It did not move for summary judgment on the ground that Dewsnup was not a falling object. Accordingly, we do not address that issue.

intention of the parties.' " *Hoffman Construction Co. v. Fred S. James & Co.*, 313 Or 464, 469, 836 P2d 703 (1992) (quoting *Totten v. New York Life Ins. Co.*, 298 Or 765, 770, 696 P2d 1082 (1985) (brackets in *Hoffman*)). To that end, we examine the terms and conditions of the policy, *Groshong v. Mutual of Enumclaw Ins. Co.*, 329 Or 303, 307, 985 P2d 1284 (1999) (citing *Interstate Fire v. Archdiocese of Portland*, 318 Or 110, 117, 864 P2d 346 (1993)), and where a particular term is not defined in the contract, we begin by identifying that term's plain meaning. *Groshong,* 329 Or at 308. If the term has no plain meaning; that is, if the term is ambiguous, we examine that term within the context of the policy as a whole. *Hoffman,* 313 Or at 470. If two or more plausible interpretations still remain, we construe the term against the drafter and in favor of the insured. *Id.* at 470-71. Accordingly, because the policy does not define "roof," we begin by asking whether that term has a plain meaning.

Without a definition of the term "roof" in the policy, both parties look to the dictionary to identify its plain meaning. According to *Webster's*, the term "roof" means "the outside cover of a building or structure including the roofing and all materials and construction necessary to maintain the cover upon its walls or other support." *Webster's Third New Int'l Dictionary* 1971 (unabridged ed 2002). The term "roofing," in turn, is defined as:

> "a material used or suitable for the construction of a roof; *specif* : a material designed for application to a roof as protection from the weather ‹slate ⇀› ‹aluminum ⇀› ‹mineral-surfaced ⇀›."

*Id.* The terms enclosed in the angle brackets—"slate [roofing]," "aluminum [roofing]," and "mineral-surfaced [roofing]"—serve as "verbal illustrations," illustrating appropriate uses of the term "roofing" in context. *See id.* at 17a (describing the purpose of examples following a definition).

The ordinary meaning of the terms "roof" and "roofing" do not expressly require that a roof must be permanent, as defendant argues. To be sure, a "roof," which consists, in part, of "roofing" materials, should be reasonably suitable to "maintain a cover upon [a building's] walls" in order to serve its function. *See id.* at 1971 (so defining the

term). "Roofing," to do the same, must provide some level of "protection from the weather." *See id.* Taken together, those definitions imply requirements of structural integrity and protection from the elements; those are functional elements, not necessarily durational ones. No roof is permanent. When a roof is sufficiently durable to serve the functional purposes described above, it is still a "roof" within the ordinary understanding of that term, even if it is not necessarily permanent.

Defendant, however, relies on three cases to support its argument that a roof, by its plain meaning, must be permanent: *Camden Fire Ins. Ass'n v. New Buena Vista Hotel Co.*, 199 Miss 585, 24 So 2d 848 (1946); *Diep v. California Fair Plan Ass'n*, 15 Cal App 4th 1205, 19 Cal Rptr 2d 591 (1993); and *Aginsky v. Farmers Ins. Exch.*, 409 F Supp 2d 1230 (D Or 2005). In our view, those cases provide less support than defendant perceives, and the most persuasive of the three cases cuts against defendant's position. We discuss those cases at greater length than we ordinarily would because we think that the reasoning in those cases helps put the issue in this case in perspective.

The first case, *Camden Fire Ins. Ass'n*, cuts in plaintiffs' favor in one respect. The roof in that case was a flat composition roof, composed of a pine sublayer, five layers of alternating felt and pitch, and a gravel layer on top. 24 So 2d at 849. In the course of repairing the roof, the plaintiffs' contractor cut a 12-by-46-foot opening in the roof, down to the pine sublayer. *Id.* When a storm came up suddenly, only two layers of felt, unsecured by any pitch, had been placed over half of the opening. *Id.* The workers sought to cover the remainder of the opening by covering it with felt and "casting themselves upon [the felt], seeking to h[o]ld it against the wind and rain." *Id.* Their efforts proved unsuccessful, and the building's owner brought a claim for damage caused by water entering through the opening that the contractor had cut in the roof, under an insurance policy substantially similar to the policy at issue here.

In resolving that claim, the Supreme Court of Mississippi held that the building did not have a "roof" within the meaning of the policy. *Id.* at 850. The court noted that "[s]uch a so-called roof would not be a roof, but only a part

thereof * * *." *Id.* In reaching that conclusion, the court in *Camden* did not hold that a roof must be permanent. Rather, the court concluded that, in order to constitute a "roof,"

> "its construction or reconstruction must have reached the point where a reasonably prudent householder would consider it, if left in that condition for a month or months, or longer, as adequate against all risks of wind and rain which could be reasonably anticipated as likely to happen according to the general and recurrent experiences of the past * * *."

*Id.* As we read the court's decision in *Camden*, it adopted a functional definition of a roof that required that the construction or reconstruction be sufficient to protect against the elements and sufficiently durable to last a month or more. The court concluded that no reasonable juror could find that a layer or two of felt, without anything to seal or secure it, would come within that functional definition.

*Camden* cuts against defendant's position in two respects. First, it does not hold that construction or reconstruction must provide a permanent seal against the weather to qualify as a roof. Its temporal requirements are far more modest. Second, the court was careful in *Camden* to examine the nature and construction of the roof. As it noted, the purported "roof" in that case consisted of *only* the pine sublayer, not both the pine sublayer and a waterproof covering. The court made clear that, under the facts in that case, the pine sublayer, either by itself or with an insecure layer of felt, did not serve the function of a roof and therefore did not bring the loss within the scope of the exception to the water damage exclusion. *See id.* at 850 ("Such a so-called roof would not be a roof, but only a part thereof, as are the rafters, or the sheeting on the rafters.").

The second case relied on by defendant, the California Court of Appeals decision in *Diep*, appears at first glance to provide greater support for defendant's argument. However, the court's cursory description of the facts makes it difficult to determine the breadth of its holding. The court explained in *Diep* only that a contractor had "removed a portion of [a warehouse] roof and covered the opening with plastic sheeting." 19 Cal Rptr 2d at 592. The decision contains no

further discussion of the nature of the opening in the roof or the way in which the plastic sheeting covered it; for instance, the decision omits any explanation whether the sheeting was securely attached to a plywood sublayer, as in this case, or was simply thrown over an otherwise gaping hole. There is a suggestion in the opinion that the latter view of the facts is the correct one. *See id.* at 593 (explaining that "part of the roof was missing, and [even the plaintiff] could not have considered [that] the plastic sheeting constituted anything other than a nonstructural band-aid").[4] But ultimately, the opinion provides such a limited recitation of the facts that the breadth of its holding is difficult to gauge.

*Diep*'s reasoning is similarly unhelpful. In defining what constitutes a roof, the court quoted three dictionary definitions, none of which contained any durational component. *See id.* The court then added, "We could go on, but a roof is commonly considered to be a permanent part of the structure it covers." *Id.* The court in *Diep* thus deduced a requirement of permanency from three sources that do not mention duration. Having done so, it then relied on the Mississippi Supreme Court's decision in *Camden*, which defined a roof primarily in terms of its function. Not only is the court's reference to permanence unsupported, but its requirement that a roof be permanent is inconsistent with its later reliance on *Camden*. It may be that on its facts, few of which are mentioned, the court reached the correct result in *Diep*, but we do not find its reasoning persuasive.

In the third case relied on by defendant, *Aginsky*, the district court noted that it was "persuaded by the authority cited by [the insurer], and in particular by *Diep*," that a roof has to be a permanent structure. 409 F Supp 2d at 1236. The court accordingly concluded that a temporary tarp, put over a roof that had been completely removed, could not be considered a roof.[5] *Id.* at 1231, 1236. The district court's decision in

---

[4] Similarly, the decision notes that even the plaintiff in *Diep* did not consider that " '[the plastic sheeting], if left in that condition for a month or months, or longer, [would be] adequate against all risks of wind and rain.' " 19 Cal Rptr 2d at 594 (quoting *Camden*, 24 So 2d at 850; first brackets in original).

[5] It appears that the contractor in *Aginsky* first removed the roof of an apartment building and put a tarp in its place. 409 F Supp 2d at 1231. It is not clear, however, from the decision what, if any, structural elements supported the tarp.

*Aginsky* provides support for defendant's position that one essential quality of a roof is permanence. However, the district court in *Aginsky* relied particularly on *Diep* in reaching that conclusion, and its conclusion is no more persuasive than the authority on which it relied.

■     In our view, neither *Diep* nor *Aginsky* provides persuasive support for defendant's contention that a roof must be permanent, and *Camden* is at odds with defendant's argument on that point. Beyond that, we note that defendant does not offer any explanation of what "permanent," in the context of a roof, means. It is not clear whether defendant defines "permanency" as one to two years, five years, 10 years, or more. We find the term "permanent," in this context, unhelpful, and decline to set a necessarily arbitrary limit on the length of time that a roof must last in order to qualify as such. Rather, a roof should be sufficiently durable to meet its intended purpose: to cover and protect a building against weather-related risks that reasonably may be anticipated. In our view, the meaning of the term "roof" is sufficiently plain that we need go no further to define its meaning. *See Hoffman*, 313 Or at 470-71 (describing methodology for interpreting insurance agreements).[6]

■     Having defined a roof for the purposes of plaintiffs' insurance policy, the remaining issue is whether no reasonable trier of fact could find that plaintiffs' roof came within that definition. *See* ORCP 47 C ("No genuine issue as to a material fact exists if, based upon the record before the court viewed in a manner most favorable to the adverse party, no objectively reasonable juror could return a verdict for the adverse party * * *."). On that issue, the record before the

The court noted only that the tarp was "burned up," *id.*, which we assume means that the contractor used some heat source, such as a blow torch, to seal the edges of the tarp to the sides of the building. Because of unexpected delays in completing the project, the contractor built a "temporary roof structure," consisting of "installed walls and a ridge and joisting system in the form of a pitched roof to run the water to the outside of the building." *Id.* The contractor put that temporary structure over the "original flat-tarped system [which it] also left in place." *Id.*

    [6] Defendant has not identified any other provisions in the policy that would lead to a different understanding of the word "roof." Under *Hoffman*, even if another meaning were plausible, we would still adopt the interpretation that favors the insured. *See* 313 Or at 470-71 (describing methodology for interpreting insurance agreements).

trial court on defendant's motion for summary judgment showed that plaintiffs' "roof," at the time of the storm, did not solely consist of a "plastic tarp," as defendant argues. Rather, it consisted of a plywood sublayer, a six-mil-thick polyethylene covering, and a system of staples, roof tacks, and wooden bats to secure the roof components in place. In plaintiffs' expert's opinion, the polyethylene sheeting was secured to the plywood sublayer in such a way that it "would have been adequate to protect the home for one or two years if necessary * * *." The expert further described the roof construction as "functionally permanent." Taking that evidence as true, as we must on review of defendant's motion for summary judgment, we conclude that a reasonable trier of fact could find that plaintiffs' roof was sufficiently durable to meet its intended purpose, which was to provide protection from the elements while plaintiffs undertook the roof repair work that the policy expressly authorized.

■　　Defendant's remaining arguments reduce, in our view, to factual disagreements with plaintiffs' expert's opinion. Defendant contends that the "[t]he plastic tarp [p]laintiffs adhered to the top of their house" cannot be a "material that can protect the structure from the elements." The only evidence in the record says otherwise, however. To the extent that defendant relies on the definition of "roofing" in *Webster's* to argue that a "roof," in order to function as such, must be composed of certain, specific materials, we think it reads too much into that definition. *Webster's* definition of "roofing" includes "verbal illustrations," examples of possible materials commonly used in the construction of a roof. *See Webster's* at 1971 (listing examples). Those examples, however, are not intended to be exhaustive, and the question whether a particular material is "suitable for the construction of a roof" is a factual issue for the jury. Given the record before the trial court, we cannot say that no reasonable juror could find that polyethylene sheeting, properly secured to a plywood sublayer, was not suitable to protect the house for the duration of the repair.

Defendant argues alternatively that, because the polyethylene sheeting suffered wind damage on the first day of its use, it is "self-evident" that polyethylene sheeting is not a suitable material for the construction of a roof. Perhaps

defendant could ask a trier of fact to draw that inference, but defendant cannot elevate a permissible factual inference to a legal rule. Under defendant's logic, if plaintiffs had used a commercially acceptable roofing material (*e.g.*, wood shakes) and if that covering had blown off on the first evening after it was installed, then wood shakes could not be considered a suitable material for use as roofing. There are a multitude of reasons why a roof may blow off on the first, second, or some successive day after its installation. Defendant errs in seeking to convert one of a multitude of potential causes into the only possible cause of the breach in plaintiffs' roof. Certainly, nothing in this record requires the inference that defendant contends we must draw.[7]

■     Given the record before the trial court, we cannot say that no reasonable juror could find that securing the polyethylene sheeting to the plywood sublayer constituted a roof for the purposes of plaintiffs' homeowners' insurance policy. It follows that the primary ground on which defendant relies did not provide a basis for granting summary judgment in its favor. As noted, before the trial court, defendant advanced an alternative ground for its summary judgment motion. It contended that, even if plaintiffs' roof could be considered a "roof" within the meaning of the policy, the damage to plaintiffs' roof resulted from "faulty or inadequate workmanship or materials" and was excluded from coverage for that reason. We turn to that argument, which, if correct, would provide an alternative ground for affirming the Court of Appeals decision and the trial court's judgment.

One section of the policy denies coverage for losses caused by "[f]aulty, inadequate or defective * * * workmanship, construction, * * * maintenance repair materials, * * * or maintenance of part or all of any property * * *." In

---

[7] Defendant advances a series of additional arguments that require only brief discussion. Defendant contends that, under its policy, there must be damage to the building, but here there was no damage. It argues alternatively that, even if the building was damaged, the wind did not cause the damage; Tim Dewsnup did when he removed the wood shakes and exposed the joints in the plywood sublayer. In a variation on the second argument, defendant contends that the wind did not cause the opening in the roof; Dewsnup did when he removed the wood shakes. All those arguments assume, incorrectly on summary judgment, that the polyethylene sheeting secured to the plywood sublayer either did not constitute a roof or was not part of the building.

response to defendant's summary judgment motion, plaintiffs offered their expert's opinion that "Tim Dewsnup's workmanship was neither faulty nor defective." Taking that statement as true, as we must on defendant's motion for summary judgment, we conclude that it is sufficient to defeat defendant's alternative ground for summary judgment.[8]

Plaintiffs did not move for summary judgment. Only defendant did. For the reasons set out above, we conclude that the trial court erred when it granted defendant's motion for summary judgment. It goes without saying that, on remand, the question whether plaintiffs' roof constituted a roof within the meaning of the policy will present a factual issue for the jury. The same is true of the question whether the workmanship was either faulty or defective. We hold only that, on this record, the grounds that defendant has raised do not provide a basis for granting summary judgment in its favor.

The decision of the Court of Appeals is reversed. The judgment of the circuit court is reversed, and the case is remanded to the circuit court for further proceedings.

**BALMER, J.,** dissenting.

When interpreting an insurance policy, Oregon courts examine the terms and conditions contained in the policy to determine the intentions of the parties. *Groshong v. Mutual of Enumclaw Ins. Co.*, 329 Or 303, 307, 985 P2d 1284 (1999). In this case, the majority concludes that the term "roof" in a homeowner's insurance policy can include an arrangement of polyethylene plastic sheeting, six one-thousandths of an inch thick, that the homeowner temporarily stapled to the plywood sublayer of what had been his roof after removing the existing wood shakes.[1] If the homeowner and a representative of the insurance company had examined the house together before the policy was issued, observed temporary plastic sheeting rather than wood

---

[8] As explained above, on this record defendant cannot prevail on summary judgment on the ground that the loss was caused by "[f]aulty, inadequate, or defective * * * maintenance repair materials."

[1] In his complaint, homeowner tellingly states that he had removed the shakes because he was "replacing the roof."

shakes covering the sublayer, and discussed whether the policy's term "roof" would apply to the temporary plastic sheeting—and thus that the policy would cover a loss from damage to the plastic sheeting for the same premium that would cover a loss from damage to an intact wood shingle or shake roof—they undoubtedly would have agreed that it did not.[2] It follows, in my view, that no reasonable juror could conclude that the term "roof" in the policy includes the plastic sheeting at issue here. For that reason, I respectfully dissent.

The majority accurately describes the coverage, exclusions, and exceptions that, when considered together, determine the kinds of losses—and the causes of those losses—that are covered by the policy at issue here. The dispute is over the meaning of the term "roof" as used in the policy.

The majority begins well enough with the proposition, "No roof is permanent." 349 Or at 41. It certainly is true that, at some level, nothing human is permanent, and, even at a more mundane level, we can all agree that house roofs need to be replaced from time to time. But the majority then jumps off a roof of its own by declaring that the concept of permanency is "unhelpful" in determining the definition of "roof." *Id.* at 44. How can that be? "Permanency" is one aspect of determining whether the materials and arrangement of the covering of a dwelling constitute a "roof," as that term is used in a homeowner's insurance policy. Simply put, there are differences in useful life—as well as in strength and imperviousness to the elements—of plastic tarps used as the covering for a dwelling, compared to a wood shake or shingle roof.

The majority instead adopts what it calls a "functional approach" to defining a roof: "When a roof is sufficiently durable to serve the functional purposes [of covering and protecting a building against weather-related risks], it is still a 'roof' within the ordinary understanding of that term,"

---

[2] To be sure, the insurer might have been willing to provide coverage for the dwelling and its contents, notwithstanding the fact that plastic sheeting rather than wood shakes covered the sublayer, but the insurer likely would have required a higher premium to offset the greater risk that the less robust material would be damaged by a storm.

even if it is not necessarily permanent. 349 Or at 41. It is true, of course, that, in some "ordinary" sense, any material that covers the top of a structure is a "roof"—whether it be a sheet of galvanized steel over a backyard shed, a canvas tarp atop a tree house, or a piece of plywood over a chicken coop. But context is key, and here the term "roof" is not used in an advertisement for a garden shed or an ordinance setting standards for keeping chickens. Rather, the context here is a *homeowner's insurance policy* and, although the term itself is not defined in the policy, it is a "term[ ] of a writing," and therefore is "presumed to have been used in [its] primary and general acceptation," ORS 42.250, in such a policy. *See Hoffman Construction Co. v. Fred S. James & Co.*, 313 Or 464, 470, 836 P2d 703 (1992) (When examining a disputed term in an insurance policy, this court considers "the particular context in which that term is used in the policy and the broader context of the policy as a whole."). The "functional approach" adopted by the majority glosses over the context in which the term "roof" is used.[3]

This policy covers a "dwelling" and describes the roof of the covered dwelling as "wood shingle or shake." No reasonable juror could conclude that the insurer and the homeowner, when they entered into the insurance contract, intended the term "roof," as it applies to this insured "dwelling," to cover a single sheet of galvanized steel, a canvas tarp, or a piece of plywood. Similarly, no reasonable juror could conclude that the parties intended the term "roof" to include the plastic tarps that the homeowner stapled to the plywood sublayer after he removed the wood shakes as a temporary measure until he could install new wood shakes.[4]

---

[3] This dissent responds to the analysis undertaken in the majority opinion. One might also question, however, the majority's premise that "whether a particular material is 'suitable for the construction of a roof' is a factual issue for the jury." 349 Or at 45. On the contrary, this court has said that the interpretation of an insurance policy is "a question of law." *Hoffman*, 313 Or at 469. Accordingly, as the Court of Appeals concluded, the determination of whether the temporary covering over plaintiff's house was a "roof" for purposes of the insurance policy is for the court, not for the jury. Certainly, if there was a dispute over what the covering consisted of, when it was installed, or some other issue of fact, that question would be for the jury. But here, where there is no such dispute, to submit to the jury the legal question of whether the covering came within the meaning of the term "roof" in the policy seems inconsistent with *Hoffman*.

[4] The majority reviews three cases cited by the insurer, which it either dismisses as not persuasive because they rely on "permanency" as an aspect of a

In deciding this case, we must, of course, put to one side the fact that the plastic tarps at issue here obviously did not adequately cover or protect the house—indeed, although the homeowner's expert stated that the arrangement "was adequate to protect the home for one or two years in normal circumstances" and that it was "functionally permanent," the plastic sheeting in fact was partially blown off *the very next day after the homeowner had installed it.*[5] We can also put to one side the question of just how much difference there is between the concept of "permanent" relied upon by the insurer and the Court of Appeals and the majority's concept of "durable."

Even without those considerations, the majority still returns to the very concept of permanency that it had just rejected in relying on the opinion of the homeowner's expert that the plastic sheeting stapled to the plywood was "functionally permanent." 349 Or at 45 (quoting expert affidavit). The expert's wording reveals what should be apparent to all: that no roof lasts forever, but that homeowners and insurers routinely distinguish between materials and types of construction that are *intended* to be "permanent" and materials and types of construction that are *intended* to be "temporary." The majority, appropriately, does not want to decide whether "permanency" is one or two years or five or ten. 349 Or at 44. And this case does not require us to make that distinction. Rather, notwithstanding the expert's affidavit, it is plain that the plastic tarps were not intended to be permanent—they were a temporary expedient, which the homeowner installed on his own after he removed the shakes as part of "replacing the roof." In agreeing to provide coverage for certain losses when the "roof" was damaged, the insurer

---

"roof"—a proposition that the majority had earlier rejected—or because they differ on the facts. *See, e.g.*, 349 Or at 44 (distinguishing contrary holding in *Aginsky v. Farmers Ins. Exchange*, 409 F Supp 2d 1230 (D Or 2005), because the temporary roof structure, consisting of walls and a ridge and joisting system, was put over a roof that had been completely removed, in contrast to the plastic here that was attached to the sublayer). The majority ignores the larger point: federal and state courts around the country have held, on summary judgment, that a temporary covering put in place while a "more permanent" roof is repaired or replaced is not a "roof" for purposes of a homeowner's insurance policy. This court should follow those decisions.

[5] The expert also inaccurately described the plastic sheeting as being six millimeters thick, rather than six mils thick—an error of approximately 3,930 percent.

did not undertake the increased risk of insuring the kind of temporary covering that the homeowner substituted for the roof referred to in the policy. Because the policy does not cover losses that resulted from damage to the covering at issue here, the trial court correctly granted the insurer's motion for summary judgment.

Linder, J., joins in this dissenting opinion.